# ILLINOIS OFFICIAL REPORTS

***People v. Maxey*, 2011 IL App (1st) 100011**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. LAMARR MAXEY, Defendant-Appellee. |
| District & No. | First District, Sixth Division<br><br>Docket No. 1–10–0011 |
| Filed | May 27, 2011 |
| Held<br><br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court's order granting defendant's motion to quash his arrest and suppress evidence was reversed, since the arresting officers were justified in making *Terry* stop based on information 911 emergency services received from several eyewitnesses at robbery, including suspect's descriptions of suspect and vehicle he was driving, all of callers provided substantially similar descriptions of suspect, that information matched one officer's initial observation of defendant two to three minutes after receiving the information by radio, and restraint of defendant following initial stop did not transform the stop into "illegal seizure" but, rather, involved short trip back to the crime scene, where he was identified by four witnesses as the offender and the officers' reasonable suspicion ripened into probable cause for defendant's arrest. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08–CR–20482; the Hon. Marcus R. Salone, Judge, presiding. |
| Judgment | Reversed and remanded. |

Counsel on
Appeal

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Mary P. Needham, and Sara A. Phillips, Assistant State's Attorneys, of counsel), for the People.

Abishi C. Cunningham, Jr., Public Defender, of Chicago (Michael Davidson, Assistant Public Defender, of counsel), for appellee.

Panel

JUSTICE R. GORDON delivered the judgment of the court, with opinion.

Justices Cahill and McBride concurred in the judgment and opinion.

## OPINION

¶ 1    Defendant Lamarr Maxey was charged by indictment with three counts of attempted aggravated robbery (720 ILCS 5/8–4(a), 18–5 (West 2008)). Defendant filed a *pro se* motion to quash his arrest and suppress evidence. Following a hearing, the trial court granted defendant's motion. On appeal, the State claims that the trial court erred in finding that the arresting police officers did not have probable cause to arrest defendant or, alternatively, the arresting police officers had reasonable suspicion to detain defendant for further investigation which ripened into probable cause to arrest. For the foregoing reasons, we reverse and remand.

¶ 2                                    BACKGROUND

¶ 3    Prior to trial, defendant filed a *pro se* motion to quash arrest and suppress evidence alleging that his initial detention was illegal because it was not based on reasonable suspicion or probable cause to arrest and, thus, evidence recovered by police subsequent to arrest should be suppressed.

¶ 4    On May 13, 2009, the trial court held a hearing on defendant's motion to quash arrest and suppress evidence. At the hearing, defendant represented himself *pro se* and called two witnesses: (1) Aselo Hernandez, one of the victims; and (2) Chicago police officer Christopher Nelligan, an investigating detective.

¶ 5    Aselo testified that at approximately 12 p.m. on October 8, 2008, he was working with his son, Hector Hernandez, at Hector's Upholstery Store, which is located on South Western Avenue in Chicago, near the intersection of 105th Street. He observed defendant enter the store with a handgun and approach them. Defendant then said to them, "it is a robbery FF's."

¶ 6    Aselo testified that he panicked and ran toward a door in the rear of the store. He testified that defendant ran after him and knocked him to the floor. He testified that while he was on the floor, defendant pointed the handgun at the back of his head. Aselo testified that

Hector approached defendant and defendant then pointed the handgun at Hector.[1]

¶ 7        Aselo testified that Hector "was able to wrestle the [handgun]" from defendant's hand and knock the handgun to the floor. He testified that Hector yelled that the handgun was a fake and defendant ran out of the store through the front door. He testified that Hector then ran after defendant. Aselo testified that he stood up, exited the store through the front door, and observed a "witness" standing in front of the store. He further testified that the witness told him that he had observed Hector chasing defendant and that he called 911 emergency services.

¶ 8        Aselo testified that he did not provide the police with a description of defendant because he was "too panicked *** to describe everything precisely." Rather, he testified that Hector described the defendant to an unnamed police officer who arrived at the store.

¶ 9        On cross-examination, Aselo testified that a police vehicle arrived "a few minutes later" after the attempted robbery and he observed defendant exit the police vehicle. He testified that he and Hector both positively identified defendant as the person who had attempted to rob them.

¶ 10        Officer Nelligan testified that on October 9, 2008, he was assigned as the investigating detective for the attempted robbery at the upholstery store. He testified that he interviewed "several witnesses" at the scene, including Hector. Officer Nelligan testified that Hector informed him that the offender drove away from the crime scene in a "red or maroon Oldsmobile" with temporary license plates.

¶ 11        During Officer Nelligan's testimony, the trial court advised defendant that he needed the assistance of a lawyer to properly present his motion and to properly examine witnesses. Defendant agreed and requested that the trial court appoint the public defender's office to assign an assistant public defender to represent him. The trial court then appointed the Cook County public defender's office and continued the hearing to October 7, 2009.

¶ 12        On June 10, 2009, an assistant public defender was assigned to represent defendant. The assistant public defender filed a new motion to quash arrest and suppress evidence, alleging that the police subjected defendant to arrest before establishing probable cause in violation of the fourth amendment of the United States Constitution.

¶ 13        On October 7, 2009, the hearing on defendant's motion to quash arrest and suppress evidence continued. At the hearing, three witnesses were called by the defense: (1) Michael

---

[1]As noted, defendant was charged by indictment on three counts of attempted aggravated robbery pursuant to section 18–5 of the Criminal Code of 1961: one count of attempted aggravated robbery of Hector; one count of attempted aggravated robbery of Aselo; and one count of attempted aggravated robbery of Aselo, who was more than 60 years of age at the time of the offense. See 720 ILCS 5/8–4(a), 18–5 (West 2008).

Sweeney, the arresting officer; (2) Laura Dunha, an employee of the Office of Emergency Management Communications (OEMC); and (3) defendant.

¶ 14    Officer Sweeney, a 17-year veteran of the Chicago police department, testified that at approximately 12 p.m. on October 9, 2008, he was driving an unmarked police vehicle westbound on 107th Street near the intersection of 107th and Halsted Streets and was responding to a radio transmission concerning an attempted robbery that had occurred on South Western Avenue. He testified that he monitored another radio transmission that described the suspect as 6 feet 2 inches tall, male, African-American, thin, wearing a light blue baseball cap, jeans, and a dark-colored vest. He did not testify whether the suspect was described in the radio transmissions as having facial hair or wearing glasses.

¶ 15    He further testified that the radio transmission further described the suspect as a driver in a "red or burgundy" automobile with temporary license plates. Officer Sweeney testified that he heard another radio transmission from Sergeant Coghlan, who observed a vehicle matching the description of the suspect's vehicle driving near the intersection of 103rd Street and Charles Street.[2]

¶ 16    Officer Sweeney testified that he drove to the intersection of 103rd Street and Vincennes, near Charles Street, and observed, within two to three minutes, a "red or burgundy older [automobile] with a temporary [license] plate driving eastbound" on 103rd Street. He further observed Sergeant Coghlan and Officer Lough[3] following the automobile in separate marked police vehicles. Officer Sweeney testified that after all three motor vehicles passed him, he turned eastbound onto 103rd Street and he and the other officers then illuminated their emergency lights.

¶ 17    Officer Sweeney testified that he curbed the automobile by driving his police vehicle in front of the automobile and slowing his vehicle until both motor vehicles stopped. He testified that from the time he heard the description of the suspect's vehicle to the time he stopped the automobile on 103rd Street, approximately two minutes had passed. He further testified that the distance from the location where he curbed the automobile to the upholstery store was approximately one mile.

¶ 18    Officer Sweeney testified that he exited his vehicle and approached the driver's side of the automobile. He observed defendant in the driver's seat and that he was "sweating profusely." He testified that he asked defendant to exit the vehicle, and the defendant complied. The officer testified that, after defendant exited the vehicle, he observed a "a dark sweater vest and a light, baby blue baseball cap" located on the front passenger seat. He further testified that when defendant exited his vehicle, defendant appeared to be

---

[2] On direct examination, Officer Sweeney testified that he heard the third transmission from "a sergeant." The officer was later recalled to testify and clarified that Sergeant Coghlan was the sergeant who made the third radio transmission.

[3] The record does not indicate Sergeant Coghlan's or Officer Lough's first name.

-4-

approximately 6 feet 2 inches tall and "matched the description" of the suspect that he had heard in the earlier radio transmissions.

¶ 19 Officer Sweeney testified that he explained to defendant that he stopped him because an "attempt robbery" had occurred on South Western Avenue and that defendant matched the description of the suspect. He testified that defendant denied any knowledge of the attempted robbery and agreed to accompany Officer Sweeney to the crime scene "to clear this up." Officer Sweeney testified that at this point defendant was not free to leave. He further testified that, before curbing defendant's vehicle, he did not observe defendant "engage in any illegal activity" and he did not have a warrant to arrest defendant.

¶ 20 Officer Sweeney testified that a police wagon arrived approximately five minutes later and defendant was placed inside the rear of the wagon. He testified that the police wagon drove defendant to the upholstery store. He further testified that, when defendant exited the wagon, the two victims and two unnamed witnesses immediately identified defendant as the offender. He testified that defendant was then placed under arrest. Officer Sweeney further testified that the arrest occurred at approximately 12:15 or 12:20 p.m. and that "the whole incident," from the time defendant was stopped to the time he was arrested, "took 15 minutes."

¶ 21 On examination by the trial court, Officer Sweeney testified that, in general, he could not determine the height of an occupant of a moving vehicle. On re-cross-examination, the officer testified that when he observed the defendant's vehicle driving on 103rd Street, he could not determine if the driver was "tall," but he could determine that the driver was male, African-American, and "slender."

¶ 22 Laura Dunha testified concerning "police event query" (event query) records, which she explained are computer printouts that document communications between a 911 emergency services dispatcher and the Chicago police department. She further explained that an event query documents the time and location of telephone calls from citizens to 911 emergency services. Duhna testified that event queries do not document radio transmissions between the police department and the individual police officers in their vehicles.

¶ 23 She further testified that an event query is "routinely kept in the course of business by OEMC." She testified that she did not participate in the creation of the event queries concerning the attempted robbery, but she was familiar with their content. Dunha was allowed to testify concerning the event query records without objection. The event query records are not included in the record on appeal.

¶ 24 Dunha testified that between approximately 12 p.m. and 12:30 p.m. on October 9, 2008, the OEMC recorded "several" telephone calls concerning the attempted robbery at the upholstery store. She specifically testified concerning four event queries. She testified that one event query indicated that a telephone call was received at 11:58 a.m. and transmitted from the intersection of South Western Avenue and 105th Street. The telephone caller stated that a black male with a handgun robbed another male and was running southbound in an alley between South Western Avenue and Artesian Street. The telephone caller described the black male as "skinny," approximately 6 feet 2 inches tall, wearing a light blue cap and a black vest. There was no mention as to whether the black male had facial hair.

¶ 25    Dunha testified that a second event query indicated another telephone call was received at 11:59 a.m. The telephone caller stated that "an Asian store manager was chasing a male black robbery offender" and that the store manager and the robbery offender were "running westbound" on 106th Street. The telephone caller described the suspect as male, black, 45 years old, 6 feet 2 inches tall, wearing a blue vest and blue jeans. There was no mention as to whether the suspect had facial hair.

¶ 26    Dunha testified that a third event query indicated a telephone call was received at 12:04 p.m. The telephone caller reported a robbery and described the suspect's vehicle as "a burgundy car with temporary license plate." The telephone caller also described the suspect as approximately 40 years old and 6 feet 3 inches tall. The caller further described the suspect as having a dark complexion and wearing a blue vest, jeans, and a hat. The caller specifically stated that the suspect did not have facial hair.

¶ 27    Dunha testified that a fourth event query indicated another telephone call was received at 12:07 p.m. The telephone caller described the suspect as "male, black, skinny, light blue cap and black jacket."

¶ 28    On cross-examination, Dunha testified concerning an event query that occurred at 12:10 p.m. between the police department and 911 emergency services. The event query indicated that a suspect in the attempted robbery of the upholstery was stopped by a police officer. She also testified that another event query that occurred at 12:13 p.m. indicated that the police were transporting the suspect to the crime scene.

¶ 29    Defendant's testimony concerning certain facts conflicted with Officer Sweeney's testimony. First, he testified that when the police stopped him, he did not have clothes or a baseball cap in his front passenger seat, but that the vest and baseball cap, which the police recovered, were located in his trunk. Second, he testified that his automobile is "light red" in color and not burgundy and that the hood of his automobile is painted black. Third, defendant claimed that he was wearing glasses at the time the police stopped him. Fourth, defendant testified that he was stopped only by one officer, Sergeant Coghlan. Fifth, defendant testified that when the police brought him to the upholstery store, he never exited the police wagon and was identified by the witnesses through a screen window on the rear door of the police wagon. Sixth, defendant testified that he had a "mustache connected to a goatee [beard]" and he introduced into evidence his arrest photograph, which depicted him with a thin, closely shaven mustache connected to a small goatee beard.

¶ 30    After defendant's testimony, the defense rested and the State made a motion for directed finding. The trial court heard arguments on both sides and granted defendant's motion to quash arrest and suppress evidence.

¶ 31    The trial court found the description of the suspect's vehicle as "sketchy" because no information was provided that indicated the vehicle's make, model, number of doors, or year of manufacture. The trial court also found the physical and clothing descriptions were of "no consequence" because defendant was not wearing the clothing described in the event queries and Officer Sweeney testified that he noticed the clothing in defendant's front passenger seat after he stopped defendant's vehicle.

¶ 32    The trial court took judicial notice that the area of 103rd Street and Vincennes

Avenue, where defendant was stopped, is predominately African-American. In its ruling, the trial court further found as follows:

"THE COURT: The burden here is a preponderance of the evidence. Did this officer have enough evidence, enough reason to believe that the occupant in this car is involved in this case? Although I'm struggling with this matter and I'm fully aware that the burden is a preponderance, really dictates my ruling. I don't know. I don't know. Let me put it another way. I can understand both arguments. I think your arguments are equally balanced. And that's not the burden. The scale has to be tilted.

THE STATE: Judge, it is the defendant's burden.

***

THE COURT: I think that the burden has shifted to you. *** I think that you have to satisfy that by a preponderance of the evidence. And I think that the evidence is so closely weighed, Officer stopped a burgundy car with temporary plates driven by an African-American."

¶ 33    The trial court then granted defendant's motion to quash arrest and suppress evidence. On November 4, the State filed a certificate of substantial impairment stating that the suppression of evidence in the present case substantially impaired the State's ability to prosecute the case. This appeal followed.

¶ 34                                                    ANALYSIS

¶ 35    On appeal, the State claims that the evidence at the hearing showed that the police officer had probable cause to arrest defendant or, alternatively, the police officer had reasonable suspicion to make the vehicle stop of defendant for investigatory purposes, which ripened into probable cause to arrest. For the reasons set forth below, we find that the police officer had reasonable suspicion to make the vehicle stop of defendant for investigatory purposes which ripened into probable cause to arrest.

¶ 36                                            Standard of Review

¶ 37    Review of a trial court's ruling on a motion to quash arrest and suppress evidence presents mixed questions of fact and law. *People v. Lee*, 214 Ill. 2d 476, 483 (2005); *People v. Bennett*, 376 Ill. App. 3d 554, 563 (2007); *People v. Novakowski*, 368 Ill. App. 3d 637, 640 (2006). "[A] trial court's factual and credibility determinations are accorded great deference, and we reverse only if the findings are against the manifest weight of the evidence." *Novakowski*, 368 Ill. App. 3d at 640; see also *People v. Pitman*, 211 Ill. 2d 502, 512 (2004); *People v. Moore*, 378 Ill. App. 3d 41, 46 (2007). Although we are deferential to findings of fact made by the trial court, we review *de novo* the application of the facts to the law to determine if suppression is warranted under those facts. *People v. Gherna*, 203 Ill. 2d 165, 175 (2003).

¶ 38                                    Incorrect Legal Standard Applied

¶ 39    As an initial matter, we find that the trial court determined that the police officer's vehicle stop and arrest of defendant was improper when it applied a preponderance of the

evidence standard. The court stated that it was "fully aware that the standard is a preponderance, [which] really dictates my ruling" in determining whether the police officer could stop or arrest. The court found both parties' arguments were "equally balanced," but that the "scale has to be tilted." This is the definition of the preponderance standard. Proof by " '[a] preponderance of the evidence is evidence that renders a fact *more likely than not*.' " (Emphasis added.) *People v. Brown*, 229 Ill. 2d 374, 385 (2008) (quoting *People v. Urdiales*, 225 Ill. 2d 354, 430 (2007)).

¶ 40    The United States Supreme Court has stated that "[f]inely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the [probable-cause] decision." *Illinois v. Gates*, 462 U.S. 213, 235 (1983). In addition, probable cause " 'does not demand any showing that such a belief be correct or more likely true than false.' ? *People v. Jones*, 215 Ill. 2d 261, 277 (2005) (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983) (plurality op.)).

¶ 41    Here, we conclude that the trial court applied an incorrect standard of proof in determining whether probable cause existed at the time of defendant's arrest. The trial court's application of the law to the facts presents a legal question, and we, as a reviewing court, remain free to assess the facts in relation to the issues raised and draw our own conclusions when deciding what relief should be granted. *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006) (citing *People v. Pitman*, 211 Ill. 2d 502, 512 (2004)); see also *People v. Moore*, 207 Ill. 2d 68, 75 (2003) ("reviewing court determines a legal question independently of the trial court's judgment"). Accordingly, we review *de novo* whether probable cause existed at the time of defendant's arrest. For the reasons set forth below, we conclude that the trial court erred in determining that no probable cause to arrest existed.

¶ 42                                    Seizure

¶ 43    The fourth amendment to the United States Constitution generally protects citizens against unreasonable seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6; *People v. Sorenson*, 196 Ill. 2d 425, 432 (2001). "A seizure occurs when the police, by means of physical force or show of authority, have in some way restrained the person's liberty." *People v. Perkins*, 338 Ill. App. 3d 662, 666 (2003). A vehicle stop implicates the fourth amendment because stopping a vehicle and detaining its occupants constitutes a "seizure" within the meaning of the fourth amendment. *Whren v. United States*, 517 U.S. 806, 809-10 (1996); *People v. Jones*, 215 Ill. 2d 261, 270 (2005).

¶ 44                          *Terry* Stop & Reasonable Suspicion

¶ 45    Generally, a seizure must be supported by probable cause. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6; *Sorenson*, 196 Ill. 2d at 432. However, a limited exception to the probable cause requirement for a seizure was recognized by the United States Supreme Court in *Terry v. Ohio*, 392 U.S. 1, 22 (1968). Pursuant to *Terry*, a police officer may, under appropriate circumstances, briefly detain a person for investigatory purposes if the officer reasonably believes that the person has committed, or is about to commit, a crime. *Terry*, 392 U.S. at 21-22. This brief investigative detention is commonly known as a *Terry* stop. *People*

-8-

*v. Lippert*, 89 Ill. 2d 171, 182 (1982). The United States Supreme Court has further determined that a vehicle stop, as in this case, is analogous to a *Terry* stop and, as a result, is generally analyzed under *Terry* principles. *Jones*, 215 Ill. 2d at 270 (citing *Knowles v. Iowa*, 525 U.S. 113, 117 (1998), *United States v. Sharpe*, 470 U.S. 675, 682 (1985), and *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984)).

¶ 46    To justify a *Terry* stop, a police officer may detain a person without having probable cause to arrest; however, the officer must have a reasonable, articulable suspicion that the person detained has committed or is about to commit a crime. *Terry*, 392 U.S. at 21-22; *People v. Lee*, 214 Ill. 2d 476, 487 (2005). Under a "reasonable suspicion" standard, the evidence necessary to justify a *Terry* stop need not rise to the level of probable cause and can even arise when no violation of the law is witnessed; however, a mere hunch is insufficient. *People v. Thomas*, 198 Ill. 2d 103, 110 (2001); *People v. Edward*, 402 Ill. App. 3d 555, 562 (2010) ("It is well settled that the facts underlying a claim of reasonable suspicion need not rise to the level of probable cause and do not require an officer to actually witness a violation."). In sum, "[r]easonable suspicion is a less exacting standard than probable cause." *People v. Ward*, 371 Ill. App. 3d 382, 412 (2007).

¶ 47    We first review the information Officer Sweeney possessed at the time before curbing defendant's vehicle. Officer Sweeney testified that he received a radio transmission at approximately 12 p.m. concerning an attempted robbery that had occurred at South Western Avenue and 105th Street. He testified that he received additional radio transmissions that the suspect had fled the crime scene in a "red or burgundy" automobile and that the vehicle had the distinctive trait of having temporary license plates. He testified that another radio transmission informed him that the suspect was driving eastbound toward the officer's location. He also testified that the suspect was described in the radio transmissions as male, African-American, "skinny," and 6 feet 2 inches tall. When he observed the defendant driving the vehicle, he did not observe him commit any violation of the law.

¶ 48    In deciding whether these facts provided Officer Sweeney with reasonable, articulable suspicion to stop defendant, we find *People v. Ross*, 317 Ill. App. 3d 26, 30 (2000), and *People v. Bennett*, 376 Ill. App. 3d 554, 564 (2007), instructive. In *Ross*, this court found that an officer had reasonable suspicion to stop the defendant when he observed the defendant, within "minutes" of a burglary, walking within the vicinity of the crime scene and where defendant matched the description of the offender, which was nothing more than "a black man wearing a blue shirt." The officer did not observe the defendant violate any laws. *Ross*, 317 Ill. App. 3d at 30.

¶ 49    In *Bennett*, this court found that an officer had reasonable suspicion to stop the defendant after the officer received a radio transmission of a shooting and description of shooter as a black male wearing a "black hoodie" running northbound on a certain street. The officer then observed, "[a] few minutes later," the defendant, who matched that description, running northbound on that same street. Again, like in *Ross*, the officer did not observe defendant violate any laws. *Bennett*, 376 Ill. App. 3d at 564.

¶ 50    Here, similar to *Ross*, Officer Sweeney testified that within two to three minutes after he received the radio transmissions, he observed a red or burgundy-colored automobile with

the distinctive temporary license plates, which matched the description of the suspect's vehicle. See also *People v. Young*, 306 Ill. App. 3d 350, 353 (1999) (officer had reasonable suspicion to stop the defendant based upon a telephone tip from the shooting victim's home that the shooter was observed driving through the victim's neighborhood in a grey "police style" Chevy with a black male passenger, and officers located a grey "police style" Chevy with two black men in the front seat within the vicinity of the victim's house almost immediately thereafter). Similar to *Bennett*, Officer Sweeney also observed the vehicle driving eastbound approximately one mile from the crime scene, as he was informed in one of the radio transmissions

¶ 51    In addition, Officer Sweeney was able to observe the driver of the vehicle. He testified that the driver of the vehicle was a male, African-American, who appeared to be "slender." That general description was consistent with the radio transmissions concerning the description of the suspect. The facts about the vehicle and the driver provided Officer Sweeney with specific and articulable facts which reasonably warranted the vehicle stop of defendant. See *People v. Staten*, 143 Ill. App. 3d 1039, 1052-53 (1986) (officer had reasonable suspicion to stop defendants after officer observed vehicle matching suspect's vehicle within "about a block" from the crime scene and 1 ½ minutes after another officer's original radio transmission describing the suspect's vehicle and the occupants).

¶ 52    Defendant argues that Officer Sweeney lacked reasonable suspicion because of the numerous inconsistencies including the fact that his vehicle's hood was painted black and his vehicle was "light red" in color and that Officer Sweeney did not testify that defendant had a mustache connected to a goatee beard, three of the callers did not mention facial hair on the suspect, and one telephone caller specifically stated that the suspect had no facial hair. However, as previously discussed, Officer Sweeney had sufficient information to make the stop because the defendant's vehicle was red or burgundy in color; the vehicle had a distinctive trait of temporary license plates; the vehicle was observed within a mile of the crime scene driving eastbound; the driver was male, African-American, and skinny–all of which matched the description of the defendant and his vehicle provided by the witnesses at the scene.

¶ 53    Defendant next argues that, although Officer Sweeney was entitled to act upon the radio transmissions to initiate the *Terry* stop, the State failed to show that the information the officer relied upon was "sufficiently reliable information" to justify the *Terry* stop.

¶ 54    Certainly, arresting officers may rely upon police radio transmissions to make a *Terry* stop or an arrest even if they are unaware of the specific facts that established reasonable suspicion to initiate a *Terry* stop or probable cause to make that arrest. *People v. Jackson*, 348 Ill. App. 3d 719, 729 (2004) (citing *People v. Lockhart*, 311 Ill. App. 3d 358, 362 (2000)); *People v. Bascom*, 286 Ill. App. 3d 124, 127-28 (1997); *People v. Perez*, 249 Ill. App. 3d 912, 917 (1993) (police officers are entitled to act upon information received in official communications to initiate a *Terry* stop). In addition, when officers are working in concert, reasonable suspicion or probable cause can be established from all the information collectively received by the officers even if that information is not specifically known to the officer who makes the arrest. *People v. Fenner*, 191 Ill. App. 3d 801, 806 (1989). However, the State must demonstrate that a "third party's information 'must bear some indicia of

reliability and must be sufficient to establish the requisite quantum of suspicion.' ? *Jackson*, 348 Ill. App. 3d at 730 (quoting *People v. Brown*, 343 Ill. App. 3d 617, 623 (2003)); see also *People v. Tisler*, 103 Ill. 2d 226, 237 (1984) (citing *Illinois v. Gates*, 462 U.S. 213 (1983)).

¶ 55 The source of the information may be identified or unidentified, an ordinary citizen or a paid informant. *Jackson*, 348 Ill. App. 3d at 730. The source may be a victim, an eyewitness, or other witness. *Jackson*, 348 Ill. App. 3d at 730. " '[I]t matters not by what name the informant is labeled; we look rather to the informant's reliability as only one of the factors to be considered in the totality of the circumstances approach.' ? *Jackson*, 348 Ill. App. 3d at 730 (quoting *People v. Adams*, 131 Ill. 2d 387, 397 (1989)). The fact that the information came either from the victim or from an eyewitness to the crime is entitled great weight in evaluating its reliability. *Jackson*, 348 Ill. App. 3d at 730 (citing *People v. Ertl*, 292 Ill. App. 3d 863, 870 (1997)); *Brown*, 343 Ill. App. 3d at 623.

¶ 56 In the case at bar, Duhna testified concerning information 911 emergency services received from eyewitness at the crime scene. The four telephone calls were also received within a 10-minute time span after the offense occurred and provided information that a robbery had occurred, the location of the robbery and description of the suspect. Duhna also testified that the information provided by the telephone callers was transmitted to the police department. Thus, the information provided here from the eyewitnesses is entitled great weight in our evaluation of its reliability, or at least a fair degree of reliability. *People v. Shafer*, 372 Ill. App. 3d 1044, 1050 (2007) (information conveyed through 911 emergency services carries a fair degree of reliability, even if the caller does not specifically identify himself or herself, because the police maintain records of the calls not only to respond to emergency situations, but to investigate false reports).

¶ 57 The information from the telephone calls appears even more reliable because all four telephone callers provided substantially similar physical descriptions of the suspect, including his clothing of a dark-colored vest, a light blue baseball cap, and jeans. One telephone caller also provided a description of the suspect's vehicle. Those descriptions were consistent with the descriptions Officer Sweeney testified that he received from the radio transmissions, namely that the suspect was male, African-American, 6 feet 2 inches tall, skinny, and driving a red or burgundy-colored automobile with temporary license plates.

¶ 58 The information was further consistent with Officer Sweeney's initial observation of defendant that occurred within two to three minutes of receiving the information from the radio transmissions. At that point in time, Officer Sweeney observed defendant, who was male, African-American and "slender" driving a "red or burgundy" colored automobile, with the distinctive temporary license plates attached, within one mile of the crime scene. As previously noted, that information provided Officer Sweeney from the radio transmissions reasonable and articulable suspicion to justify a *Terry* stop.

¶ 59 Defendant next claims that, even if this court determines that the vehicle stop constituted a proper *Terry* stop, the continued detention of defendant was an "unconstitutional seizure." Defendant first argues that the stop escalated into an "illegal seizure" when defendant was "not allowed to drive past police vehicles blocking his car" and when Officer Sweeney determined defendant was not free to leave. We do not find

defendant's argument persuasive.

¶ 60    The restraint of defendant in this case did not transform the *Terry* stop into an "illegal seizure" or an arrest. Under *Terry*, a police officer is specifically permitted to briefly detain an individual to investigate the possibility of criminal behavior absent probable cause to arrest. *Terry*, 392 U.S. at 21-22; *People v. Bennett*, 376 Ill. App. 3d 554, 565 (2007) (citing *People v. Young*, 306 Ill. App. 3d 350, 354 (1999)). During the course of a *Terry* stop, a person is "no more free to leave than if he were placed under a full arrest." (Internal quotation marks omitted.) *Ross*, 317 Ill. App. 3d at 32 (quoting *People v. Paskins*, 154 Ill. App. 3d 417, 422 (1987), quoting *People v. Roberts*, 96 Ill. App. 3d 930, 933 (1981)). Thus, mere restraint does not turn an investigatory stop into an arrest. *Young*, 306 Ill. App. 3d at 354. Rather, an arrest is distinguishable from an investigatory stop based on the length of detention and the scope of the investigation following the initial stop. *Bennett*, 376 Ill. App. 3d at 565; *Ross*, 317 Ill. App. 3d at 30; *Young*, 306 Ill. App. 3d at 354. The State bears the burden of showing that a seizure based on reasonable suspicion was sufficiently limited in duration and scope. *Ross*, 317 Ill. App. 3d at 30.

¶ 61    In the case at bar, the length of defendant's detention and the scope of the investigation were sufficiently limited. Officer Sweeney testified that within two to three minutes of receiving radio transmissions concerning the description of the suspect's vehicle, he stopped defendant's vehicle, which matched that description. After exiting his police vehicle and speaking with defendant, the officer radioed for a police wagon, which arrived within five minutes. The defendant was then transported by the police wagon to the upholstery store, which was located approximately one mile from the location of the vehicle stop. Officer Sweeney testified that the from the time he received the radio transmissions to the time he arrested defendant was approximately 15 minutes.

¶ 62    In addition, Duhna testified to a timeline that was similar to Officer Sweeney's timeline concerning the length of defendant's detention. She testified that an event query documented that a police officer stopped the suspect at approximately 12:10 p.m. and the suspect was transported to the crime scene at 12:13 p.m. As noted, Officer Sweeney testified that he arrested defendant at approximately 12:15 p.m. or 12:20 p.m.

¶ 63    Considering factors such as the five-minute waiting time for the police wagon to transport defendant and the approximate one-mile distance from the location of the *Terry* stop to the crime scene, we cannot say that the less-than-15-minute detention of defendant was too long in duration. See, *e.g.*, *People v. O'Dell*, 392 Ill. App. 3d 979, 987 (2009) (90-minute detention of the defendant was not too long in duration to be justified as an investigatory stop where the length of time required to confirm or dispel the officer's suspicions was attributable to factors such as the early morning hour when the stop occurred); *Ross*, 317 Ill. App. 3d at 30-31 (eight-minute time lapse between the time police effectuated the defendant's stop to the time of arrest following victim's positive identification of defendant via a radio dispatch fell within permissible scope of *Terry* stop).

¶ 64    The scope of the investigation was also sufficiently limited. At the time of the vehicle stop, Officer Sweeney testified that he explained to defendant the reason for the stop and defendant denied involvement in the attempted robbery. Defendant then agreed to be

transported to the upholstery store for identification purposes "to clear this up." After being transported to the upholstery store, four witnesses immediately identified him as the offender. Officer Sweeney then placed defendant under arrest. A brief detention for the purpose of a quick determination as to defendant's involvement in the attempted robbery comports with the permissible scope of an investigation after a *Terry* stop. *Ross*, 317 Ill. App. 3d at 30-31 (eight-minute time lapse between the time police effectuated the defendant's stop to the time of arrest following victim's positive identification of the defendant fell within permissible scope of *Terry* stop); see also *Young*, 306 Ill. App. 3d at 354 (detention reasonably limited to obtaining an immediate identification of defendant by the victim).

¶ 65    Defendant also argues that his transportation in a police wagon to the crime scene for identification purposes constituted an unreasonable seizure under the fourth amendment. We disagree.

¶ 66    The purpose of a *Terry* stop is to allow a police officer to investigate the circumstances that provoke suspicion and either confirm or dispel his or her suspicions. *Ross*, 317 Ill. App. 3d at 31 (citing *People v. Fasse*, 174 Ill. App. 3d 457, 460-61 (1988)). Our supreme court has determined that the transportation of a defendant to the crime scene for the purpose of obtaining an immediate identification of defendant by eyewitnesses, also referred to as a "showup," is not necessarily an unreasonable seizure under the fourth amendment. *People v. Lippert*, 89 Ill. 2d 171, 181-82 (1982). "While showups are disfavored, they may be justified by circumstances, such as the need to determine: (1) whether a suspect is innocent and should be released immediately; and (2) whether the police should continue searching for a fleeing culprit while the trail is still fresh." *People v. Rodriguez*, 387 Ill. App. 3d 812, 830 (2008).

¶ 67    In this case, Officer Sweeney's decision to transport defendant to the crime scene was reasonable under the circumstances, because defendant denied involvement in the attempted robbery and agreed to be transported to the crime scene for immediate identification purposes. As noted, defendant was then transported approximately one mile from the location of the *Terry* stop to the upholstery store where the two victims and two witnesses positively identified him as the offender. Accordingly, we cannot say that the transportation of defendant to the crime scene was an unreasonable seizure under the fourth amendment. See, *e.g.*, *Ross*, 317 Ill. App. 3d at 31 (finding transportation to crime scene for an immediate identification to either inculpate or exculpate the suspect was minimally intrusive when compared to the benefit of the immediate investigation); see also *Bennett*, 376 Ill. App. 3d at 566 (same). Accordingly, we conclude that the investigatory stop of defendant was proper.

¶ 68    Having found that the police had reasonable suspicion to justify a *Terry* stop of defendant, we further find that the reasonable suspicion ripened into probable cause to arrest.


¶ 69                    The Arrest and Probable Cause

¶ 70    In contrast to a *Terry* stop, a full-blown arrest requires the higher standard of probable cause. " 'Probable cause to arrest exists when the facts known to the officer at the time of the arrest are sufficient to lead a reasonably cautious person to believe that the arrestee has committed a crime.' ? *People v. Jackson*, 232 Ill. 2d 246, 275 (2009) (quoting *People v.*

*Wear*, 229 Ill. 2d 545, 563-64 (2008), citing *People v. Love*, 199 Ill. 2d 269, 279 (2002)). "The probable-cause standard is incapable of [a] precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (citing *Illinois v. Gates*, 462 U.S. 213, 232 (1983), and *Brinegar v. United States*, 338 U.S. 160, 175 (1949)). The existence of probable cause depends upon the totality of the circumstances at the time of the arrest. *Love*, 199 Ill. 2d at 279.

¶ 71 In the case at bar, the evidence provided at the hearing established that Officer Sweeney had reasonable, articulable suspicion to make a proper *Terry* stop of defendant's vehicle. Officer Sweeney received radio transmissions which informed him of an attempted robbery, the location where the crime occurred, a physical description of the suspect, which included a description of the suspect's vehicle that had a distinctive trait of temporary license plates. Officer Sweeney received an additional radio transmission that the suspect was driving eastbound in his vehicle near Officer Sweeney's location, which was approximately one mile from the crime scene.

¶ 72 Within two to three minutes, Officer Sweeney observed a vehicle "red or burgundy" in color with the distinctive temporary license plates, matching the description of the suspect's vehicle, driving eastbound as reported. He further observed that the driver was male, African-American, and "slender," which matched the physical characteristics of the suspect.

¶ 73 After stopping defendant's vehicle, the officer approached defendant's vehicle and observed that the defendant was "sweating profusely." He further discovered a "dark jacket" and a "light baby blue" baseball cap in the vehicle, which was similar to the description of the clothing worn by the suspect at the time of the offense. He asked the defendant to exit his vehicle and then observed that defendant was approximately 6 feet 2 inches tall, which matched the description of the suspect's height that was provided in the radio transmissions and was consistent with Dunha's testimony concerning the suspect's height described in the telephone calls from the eyewitnesses at the scene.

¶ 74 After Officer Sweeney testified that he informed defendant the reason for the vehicle stop and defendant agreed to accompany the officer to the crime scene for identification purposes. Upon arriving at the crime scene, the two victims and two witnesses immediately identified defendant as the offender. At that point in time, Officer Sweeney arrested defendant.

¶ 75 "[W]hether probable cause exists is governed by commonsense considerations, and the calculation concerns the probability of criminal activity, which does not even demand a showing that the belief that the suspect has committed a crime be more likely true than false." *People v. Hopkins*, 235 Ill. 2d 453, 477 (2009). Considering the totality of the circumstances, the facts known to the officer at the time of the arrest were sufficient to lead a reasonably cautious person to believe that defendant was the suspect in the attempted robbery at the upholstery store, and thus the arrest was lawful. Therefore, the trial court erred in granting defendant's motion to quash arrest and suppress evidence, and reversal is warranted.

¶ 76                                    CONCLUSION

¶ 77         For the foregoing reasons, we find that the police officer had reasonable suspicion to make the vehicle stop of defendant for investigatory purposes which ripened into probable cause to arrest, and thus the ruling of the trial court is reversed and remanded.

¶ 78         Reversed and remanded.