2021 IL App (1st) 201050-U

FIFTH DIVISION
June 11, 2021

No. 1-20-1050

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County |
| | ) | |
| Respondent-Appellant, | ) | |
| | ) | |
| v. | ) | No. 15 CR 10914 |
| | ) | |
| GERMEL DOSSIE, | ) | |
| | ) | Honorable William H. Hooks, |
| Petitioner-Appellee. | ) | Judge, presiding. |
| | ) | |

PRESIDING JUSTICE DELORT delivered the judgment of the court.
Justices Hoffman and Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held:*  We reverse the circuit court's order quashing defendant's arrest and suppressing evidence. The police had probable cause to arrest defendant and the use of an investigative alert did not invalidate the arrest.

¶ 2                                BACKGROUND

¶ 3    Defendant Germel Dossie was arrested pursuant to an investigative alert related to the shooting of Clifton Frye. Frye later died of his injuries and defendant was charged with six counts of first-degree murder (720 ILCS 5/9-1(a) (West 2014)). Defendant moved to quash his arrest and suppress an incriminating statement that he made while under arrest. He argued that

the police did not have probable cause to arrest him and that the use of an investigative alert, rather than an arrest warrant, was unconstitutional. The court held an evidentiary hearing on the motion, during which several police officers testified.

¶ 4       Officer Nicolas Sanchez testified that on June 1, 2015, he and his partner were engaged in narcotics surveillance in the Rogers Park neighborhood of Chicago. Around 1:00 p.m., Sanchez observed Clifton Frye in a red Pontiac, conducting what Sanchez suspected to be a hand-to-hand narcotics transaction. Sanchez and his partner then lost sight of Frye's car. Shortly thereafter, a report of "shots fired" came across the police radio. Sanchez and his partner drove to the scene and found Frye on the ground injured.

¶ 5       After other officers and detectives arrived on the scene, Sanchez went into a building near the corner of Ashland Avenue and Jonquil Terrace to view its surveillance video. According to Sanchez, the video showed two Black males in their teens or early twenties, dressed in dark clothing with hooded jackets. The men were shown running eastbound on the south sidewalk of Jonquil Terrace, one with a revolver in his hand and the other with his left hand in his jacket pocket.

¶ 6       Detective Brian Tedeschi testified that he was assigned to investigate the shooting of Clifton Frye. He testified, based on information he received from other officers, that security camera footage from a building near the corner of Ashland Avenue and Jonquil Terrace showed a red Hyundai Santa Fe driving westbound on Jonquil through the intersection with Ashland. A short time later, the same car drove eastbound through the intersection and out of frame. The video then showed two individuals running from the direction of the car to the intersection. At the intersection, one of the individuals turned onto Ashland Avenue and out of frame. He came

back into frame shortly thereafter, and the two individuals sprinted back in the direction of the car. The Hyundai's license plate was clearly visible in the footage.

¶ 7     Tedeschi later learned that another police officer had located the car from the video. In the car were Tyrone Crosby and his grandmother. Tedeschi testified that Crosby was taken in for questioning. Crosby told Tedeschi that he was driving the car at the time of the shooting. He told Tedeschi that he had picked up individuals known to him as Lil' Shawn and Spazz. Crosby said that after they reached the intersection of Ashland and Jonquil, they circled back, and he stopped to let Lil' Shawn and Spazz out of the car. Shortly thereafter, Crosby heard gunshots and Lil' Shawn and Spazz came running back to the car. Spazz had a "large-barrel handgun" in his hand, and Lil' Shawn was holding his side.

¶ 8     Tedeschi testified that, based on Crosby's statements, he searched a police database for the nicknames "Lil' Shawn" and "Spazz". The results of that search led Tedeschi to identify Lil' Shawn as Shawn Randall and Spazz as defendant. Tedeschi then issued investigative alerts for both Randall and defendant.

¶ 9     Tedeschi testified that the next morning, June 2, Crosby gave a recorded statement to an assistant Cook County State's Attorney. During the statement, Crosby identified a photo of defendant as Spazz. Crosby also reaffirmed his statement that defendant was the individual with the "large-barrel handgun". Tedeschi testified that later that day, Crosby also testified before a grand jury. During that testimony, Crosby again identified defendant.

¶ 10    Officer Chris Dingle testified that on June 9, 2015, he was working on "fugitive apprehension" detail. While he and his partners were conducting undercover surveillance, he observed defendant leaving an apartment building and get into a car. Once defendant drove off, Dingle followed him and radioed for a marked police car to initiate a stop.

¶ 11    After a marked car pulled defendant over, another officer handcuffed him and put him in the car. Dingle testified that defendant was taken to the police station. Dingle testified that he did not have an arrest or search warrant for defendant at the time of the arrest. He also testified that he did not witness defendant commit any crimes and that defendant complied with all police requests.

¶ 12    Dingle testified that the investigative alert stated that defendant was involved in an aggravated battery with a handgun. However, the investigative alert did not specify the nature of that involvement. He also testified that he later learned that the Illinois Department of Corrections had issued a juvenile warrant for defendant, but that he was unaware of that warrant at the time of the arrest.

¶ 13    The circuit court heard closing argument and reviewed additional briefing. In its ruling, the court found that defendant's arrest, pursuant to an investigative alert, was unconstitutional. The court analyzed a then-existing split of authority between panels of this district of the Appellate Court on the issue and concluded that the use of investigative alerts is a "questionable, constitutionally-offensive Chicago-only policy" that impermissibly circumvents the warrant requirements of the United States and Illinois constitutions. Of particular concern to the court was the lack of exigent circumstances; the police had Crosby testify before a grand jury within a day of the shooting but did not arrest defendant until a week later. However, the record showed no indication that the police ever sought an arrest warrant.

¶ 14    The circuit court also held that even if the use of an investigative alert did not invalidate the arrest, the police lacked probable cause to arrest defendant. In its ruling, the court specifically found that the witnesses had all offered credible testimony during the hearing. However, the court questioned the reliability of the information provided by Crosby. The court explained that

had the police sought a warrant in the first instance, it would have requested information about Crosby's criminal history, the conditions under which he gave information to the police, and other considerations that would bear on his credibility. Crosby's background, the court observed, "is a mystery to the universe," unprobed by the mechanisms designed to ensure that arrest warrants issue only upon probable cause.

¶ 15    Moreover, the court noted that Crosby did not identify defendant by name, but only as "Spazz." The State provided no evidence about the reliability of the database used to link that nickname to defendant, including how that database was compiled and maintained, or how many individuals were linked to the nickname "Spazz." Because of these unanswered questions about the reliability of Crosby and the police database, the court ruled that the police lacked probable cause to arrest defendant.

¶ 16    On two separate grounds, therefore, the circuit court granted defendant's motion, quashed his arrest, and suppressed all evidence stemming from the arrest. The State filed a certificate of substantial impairment, and this appeal followed.

¶ 17                                  ANALYSIS

¶ 18    The State makes three arguments for reversing the circuit court's ruling on defendant's motion: (1) that the court erred in finding that arrests based on investigative alerts are *per se* unconstitutional, (2) that the court erred in finding that police lacked probable cause to arrest defendant, and (3) even if the arrest was unconstitutional, the exclusionary rule should be relaxed because the police acted in good faith.

¶ 19    Our review of a ruling on a motion to quash arrest and suppress evidence presents questions of both fact and law. See *People v. Luedemann*, 222 Ill. 2d 530, 542-43 (2006). We give great deference to factual findings and will not disturb them unless they are against the

manifest weight of the evidence. *People v. Burns*, 2016 IL 118973, ¶ 15. The circuit court's ultimate ruling on the motion, however, is a question of law which we review *de novo*. *Id.* ¶ 16.

¶ 20    In ruling that defendant's arrest was unconstitutional because it was based on an investigative alert, the circuit court relied upon *People v. Bass*, 2019 IL App (1st) 160640, ¶ 71, *aff'd in part, vacated in part*, 2021 IL 125434, ¶ 34 (holding that "an arrest [is] unconstitutional when effectuated on the basis of an investigative alert issued by the Chicago Police Department."). Although other panels of this court subsequently disagreed with *Bass*—beginning with *People v. Braswell*, 2019 IL App (1st) 172810—*Bass* remained good law at the time of the circuit court's ruling in this case and the circuit court was entitled to follow it. See *People v. Harris*, 123 Ill. 2d 113, 128 (1988) ("It is fundamental in Illinois that the decisions of an appellate court are binding precedent on all circuit courts regardless of locale"), citing *People v. Thorpe*, 52 Ill. App. 3d 576, 579 (1977).

¶ 21    Defendant argues that the *Braswell* court and subsequent courts misread *Bass*. He contends that *Bass* did not stand for the proposition that the use of investigative alerts is *per se* unconstitutional, notwithstanding the court's statement that "[w]e hold an arrest unconstitutional when effectuated on the basis of an investigative alert issued by the Chicago Police Department." See *Bass*, 2019 IL App (1st) 160640, ¶ 71. Rather, he argues, *Bass* stood for the proposition that an investigative alert is not an adequate substitute for a warrant in a case where a warrant is required. See *id.* ¶ 62 ("in the ordinary case, a warrant [must] issue before an arrest can be made. Arrests based on investigative alerts violate that rule."). But defendant's reliance on *Bass* is misplaced because our supreme court has now vacated those portions of *Bass* analyzing the constitutionality of investigative alerts. *People v. Bass*, 2021 IL 125434, ¶ 31. Without a definitive resolution of this issue from our supreme court, we will continue to follow *Braswell*

and the line of cases disagreeing with *Bass*. See, *e.g.*, *People v. Simmons*, 2020 IL App (1st) 170650, ¶ 64; *People v. Bahena*, 2020 IL App (1st) 180197, ¶¶ 59-64; *People v. Thornton*, 2020 IL App (1st) 170753, ¶¶ 45-50. Consequently, we find the circuit court erred in ruling that the arrest was unconstitutional simply because it was based on an investigative alert.

¶ 22    We note that the timing of the *Bass* decisions put the circuit court and the parties in a difficult position. The evidentiary hearing in this case took place on non-consecutive days, and this court issued its opinions in *Bass* and *Braswell* between those days. Coincidentally, the Illinois Supreme Court issued its opinion in *Bass* after this appeal was partially briefed. The state of the law has been in flux and our supreme court has specifically vacated the appellate court's holding in *Bass* on which the circuit court relied. We choose to follow the most recent case law on point, which requires us to reverse the circuit court on this issue.

¶ 23    Turning to the second issue, we find that the circuit court erred in ruling that there was not probable cause for the police to arrest defendant. "[P]robable cause exists when the facts known to the [arresting] officer at the time are sufficient to lead a reasonably cautious person to believe that the arrestee has committed a crime, based on the totality of the circumstances. The standard is the probability of criminal activity, not proof beyond a reasonable doubt or even that it be more likely than not." *People v. Gocmen*, 2018 IL 122388, ¶ 19. "When officers are working in concert, probable cause can be established from all the information collectively received by the officers even if that information is not specifically known to the officer who makes the arrest." *People v. Buss*, 187 Ill. 2d 144, 204 (1999) (quoting *People v. Bascom*, 286 Ill. App. 3d 124, 127 (1997)). When relying on third-party information, the State must establish that such information bears "some indicia of reliability and must be sufficient to establish the

requisite quantum of suspicion." *People v. Maxey*, 2011 IL App (1st) 100011, ¶ 54 (quoting *People v. Jackson*, 348 Ill. App. 3d 719, 730 (2014)).

¶ 24    There are no contested issues of fact because the circuit court specifically found that all the witnesses at the hearing were credible. Therefore, we simply review, *de novo*, the court's ultimate ruling. See *Burns*, 2016 IL 118973, ¶¶ 15-16. The evidence at the hearing established that police officers quickly responded to a report of "shots fired" and found Clifton Frye on the ground injured. The evidence showed that the police then viewed surveillance video from a nearby building, which showed two Black males getting out of a red Hyundai Santa Fe, running to the street corner, then running back to the car. The police located that car, and questioned one of its occupants, Tyrone Crosby. Crosby's account of the afternoon included picking up an individual later identified as defendant, driving to the scene of the crime, seeing defendant with a handgun in his hand, and driving away after hearing gunshots.

¶ 25    In his brief, defendant—as did the circuit court its ruling—speculates about reasons that Crosby may not have been reliable. However, the State need not establish that third-party information be unimpeachable, only that it has "some indicia of reliability". *Maxey*, 2011 IL App (1st) 100011, ¶ 54. Crosby's account was corroborated by the security video, which showed a red Hyundai Santa Fe—the same car in which Crosby was first located by the police—at the scene of the crime. The video and Crosby also both depicted two Black males getting out of that car, going to the street corner, then sprinting back to the car. And although Crosby only identified defendant by a nickname, he did identify a photo of defendant as "Spazz" and described picking up Spazz in his car and seeing Spazz holding a "large-barrel handgun" at the scene of the crime.

¶ 26    Taken together, the information collectively known to the police would have led a reasonably cautious person to believe that defendant had committed a felony. Consequently, the

police had reasonable cause to make the arrest. See *Gocmen*, 2018 IL 122388, ¶ 19. Having concluded that the circuit court erred in granting defendant's motion to quash his arrest and suppress evidence, we do not reach the State's argument that the exclusionary rule should be relaxed because the police acted in good faith.

¶ 27                                   CONCLUSION

¶ 28    We reverse the circuit court's order granting defendant's motion to quash his arrest and supress evidence, and we remand the case for further proceedings.

¶ 29    Reversed and remanded.