2021 IL App (1st) 181966-U

No. 1-18-1966

Order filed August 26, 2021

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 14924 |
| | ) | |
| NAJEE REED a/k/a MERCHANT WHITAKER, | ) | Honorable |
| | ) | Thaddeus L. Wilson, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE GORDON delivered the judgment of the court.
Justices Lampkin and Reyes concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The circuit court's judgment is affirmed where defendant's trial counsel was not ineffective for failing to move to quash defendant's arrest and suppress evidence because the arresting officers had reasonable suspicion to stop defendant.

¶ 2    Following a bench trial, defendant Najee Reed, a/k/a Merchant Whitaker, was convicted of being an armed habitual criminal and sentenced to nine years' imprisonment. On appeal, he alleges his trial counsel provided ineffective assistance by failing to move to quash his arrest and suppress his ensuing statement, where the police illegally stopped defendant. We affirm.

¶ 3    Defendant was charged by indictment with one count of being an armed habitual criminal, four counts of unlawful use or possession of a weapon by a felon (UUWF), and four counts of aggravated unlawful use of a weapon, premised on an incident in Chicago on September 23, 2017. The State proceeded on one count of being an armed habitual criminal (720 ILCS 5/24-1.7(a) (West 2016)) and two counts of UUWF (720 ILCS 5/24-1.1(a) (West 2016)), and nol-prossed the remaining counts.

¶ 4    At trial, Chicago police officer Andrew Braun testified that on September 23, 2017, at about 10:45 p.m., he and his partner Officer Arturo Fonseca were on patrol around the 840 block of East 64th Place. They were in an unmarked vehicle and wore plainclothes, bulletproof vests displaying Chicago Police Department insignia, and duty belts. They turned southbound into an L-shaped alley lit with streetlights and first observed Javon Jones and then defendant, whom Braun identified in court. Jones stood at the corner where the alley turned east and defendant was about 10 feet east of Jones. Jones did not have anything in his hands, and Braun did not observe him make any throwing motions.

¶ 5    The officers drove halfway down the alley. Jones looked in defendant's direction and yelled, " '12-12, go, go, go.' " Based on Braun's training and experience, he interpreted " '12' " to mean "police." Defendant climbed over a chain-link fence into a yard. Braun heard what he opined was a metal object striking concrete near the fence. The officers exited their vehicle, and Fonseca ran northbound in the alley in the direction defendant was running.

¶ 6    Braun "detained" Jones at the corner of the alley and then went to the fence defendant went over. He recovered a handgun from the middle of the "sidewalk" near where defendant had climbed over the fence. Fonseca then brought defendant back to Braun's location, and defendant

was placed into custody. Less than one minute passed from the moment Braun "turned the corner" to the moment the handgun was recovered and defendant was arrested. Fonseca Mirandized defendant at the scene. At the police station, Braun spoke with defendant in Fonseca's presence. Braun could not remember what defendant stated "verbatim," but testified defendant "related that the gun belonged to Javon Jones and that he was holding it for him."

¶ 7    The State entered into evidence photographs Braun identified as the entrance to the alley, the corner in the alley, the locations where the officers observed Jones and defendant, the fence he observed defendant going over, and the "sidewalk in the backyard" where he recovered the handgun. Braun testified there were no other objects laying where he recovered the handgun.

¶ 8    On cross-examination, Braun testified the weather was clear. The alley was in a residential area with apartment buildings on both sides and a church at the end of the alley. Braun's police vehicle had an " 'M' plate *** on it." The officers were about three-fourths of the way down the alley before they encountered Jones. When Braun first observed Jones, he appeared to have stepped out from around the corner on the front left side of Braun's vehicle. Braun was about 10 feet away from Jones when Jones said " '12-12.' "

¶ 9    Braun did not observe defendant until he reached the corner of the alley and exited his vehicle. When Braun first observed defendant, defendant was 10 to 15 feet away, with his left side facing the police vehicle, going over the fence, which was about five feet tall. Defendant was "moving fast," as he was on top of the fence in the process of going over it when Braun first observed him, and went over the fence in a "slit [*sic*] second." Braun also went over the fence. Braun could not recall whether the fence could be "walk[ed] through" or where the entrance was located.

¶ 10    Fonseca ran back north through the alley, detained defendant in front of a building north of the fence, and brought defendant to Braun two or three minutes after Braun went over the fence. Braun never observed the handgun in defendant's hand or falling to the ground, and he did not know whether the handgun "came from a pocket or any kind of a bag" or whether any DNA or fingerprints were recovered from the firearm. Besides Jones, there were no other people outside or in the alley when Braun went over the fence. During the incident, neither Braun nor Fonseca was wearing a body camera and their vehicle also did not have a camera. Defendant's statement was not recorded.

¶ 11    Braun testified that a photograph depicted the fence defendant went over and the "sidewalk" inside the backyard where Braun recovered the firearm. A photograph of the fence in the record on appeal shows that the fence had a gate that was locked with a padlock and chain.

¶ 12    The State entered certified copies of conviction into evidence showing defendant was sentenced to four years' imprisonment for a Class 1 residential burglary conviction in 2014, and sentenced to four years' imprisonment for a Class 2 UUWF conviction in 2016.[1]

¶ 13    The trial court found defendant guilty on all counts.

¶ 14    Defendant filed a motion for new trial, and a subsequent amended motion for new trial. The court denied defendant's motions.

¶ 15    The trial court merged defendant's two UUWF counts into the armed habitual criminal count and sentenced defendant to nine years' imprisonment.

---

[1] The residential burglary conviction is under the name "Marchant Whitaker" and the UUWF conviction is under the name "Merchant Whitaker." The parties stipulated that defendant was both those named individuals.

¶ 16     On appeal, defendant alleges his trial counsel provided ineffective assistance by failing to move to quash defendant's arrest and suppress his statement, because the police officers illegally stopped defendant. The State responds that defendant's ineffective assistance claim must fail because any motion to quash and suppress would have lacked merit, where the police officers not only had reasonable suspicion to stop defendant but also had probable cause to arrest him for the handgun he dropped while fleeing from police.

¶ 17     The sixth amendment to the United States Constitution (U.S. Const., amend. VI), guarantees criminal defendants the right to effective assistance of counsel. *People v. Cole*, 2017 IL 120997, ¶ 22. To succeed on an ineffective assistance claim, a defendant must demonstrate that (1) "counsel's performance was objectively unreasonable under prevailing professional norms," and (2) "there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *People v. Cathey*, 2012 IL 111746, ¶ 23 (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). While a defendant must satisfy both prongs of the *Strickland* test (*People v. Jackson*, 2020 IL 124112, ¶ 90), we may resolve an ineffective assistance claim based on the prejudice prong without considering whether counsel's performance was deficient, if the defendant suffered no prejudice due to the allegedly defective performance (*People v. Pulliam*, 206 Ill. 2d 218, 249 (2002)).

¶ 18     The decision to file a motion to quash arrest and suppress evidence is "traditionally viewed as one of trial strategy," and counsel "benefits from a strong presumption that his failure to challenge the validity of the accused's arrest or to seek the exclusion of certain evidence was proper." *People v. Little*, 322 Ill. App. 3d 607, 611 (2001). To establish prejudice due to counsel's failure to bring a motion to quash and suppress, the defendant must demonstrate "that the unargued

suppression motion is meritorious, and that a reasonable probability exists that the trial outcome would have been different had the evidence been suppressed." *People v. Henderson*, 2013 IL 114040, ¶ 15.

¶ 19  The fourth amendment of the United States Constitution and the Illinois Constitution guarantee the "right of individuals to be free from unreasonable searches and seizures." *People v. Colyar*, 2013 IL 111835, ¶ 31; U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. "Reasonableness under the fourth amendment generally requires a warrant supported by probable cause." *People v. Flowers*, 179 Ill. 2d 257, 262 (1997). However, " '[w]hen faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like, *** certain general, or individual, circumstances may render a warrantless search or seizure reasonable.' " *People v. Jones*, 215 Ill. 2d 261, 269 (2005) (quoting *Illinois v. McArthur*, 531 U.S. 326, 330 (2001)). Courts have categorized police-citizen encounters into three tiers: (1) the arrest of a citizen, which must be supported by probable cause; (2) a "temporary investigative seizure," or *Terry* stop, conducted pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968); and (3) a consensual encounter, which involves "no coercion or detention" and thus implicates no fourth amendment interests. *People v. McDonough*, 239 Ill. 2d 260, 268 (2010). Under the "fruit of the poisonous tree" doctrine, any evidence obtained by exploiting a fourth amendment violation "is subject to suppression as the 'fruit' of that poisonous tree." *Henderson*, 2013 IL 114040, ¶ 33.

¶ 20  At issue on appeal is whether the police officers conducted a proper *Terry* stop of defendant.[2] We find they did.

---

[2] Defendant does not argue the police officers lacked probable cause to arrest him and has thus forfeited this issue. Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing.").

¶ 21    Under *Terry*, " 'where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot \*\*\*,' " the officer may briefly stop the suspicious person and make 'reasonable inquiries' aimed at confirming or dispelling his suspicions." *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (quoting *Terry*, 392 U.S. at 30). In other words, in order to properly conduct a *Terry* stop, "[t]he officer must have a reasonable, articulable suspicion that criminal activity is afoot." (Internal quotation marks omitted.) *People v. Timmsen*, 2016 IL 118181, ¶ 9. While this standard is "less demanding" than the probable cause standard, "an officer's suspicion must amount to more than an inchoate and unparticularized suspicion or hunch of criminal activity." (Internal quotation marks omitted.) *Timmsen*, 2016 IL 118181, ¶ 9. Police officers are not required to "rule out all possibility of innocent behavior" before conducting a *Terry* stop. (Internal quotation marks omitted.) *People v. Close*, 238 Ill. 2d 497, 511 (2010). "[N]ervous, evasive behavior" is a "pertinent factor" when determining reasonable suspicion. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000).

¶ 22    In determining reasonable suspicion, courts consider the totality of the circumstances known to the officer and view those facts "from the perspective of a reasonable officer at the time of the stop." (Internal quotation marks omitted.) *People v. McMichaels*, 2019 IL App (1st) 163053, ¶ 22. Where, as here, multiple officers worked in concert to detain a defendant, reasonable suspicion can be established from all the information collectively received by the officers, even if the information was not known to the officer who made the detention. *People v. Maxey*, 2011 IL App (1st) 100011, ¶ 54.

¶ 23    The evidence at trial overwhelmingly showed that Officers Braun and Fonseca had a "reasonable, articulable suspicion" that criminal activity was afoot when they detained defendant.

The officers observed Jones and defendant in an alley in a residential area at night and, upon observing the officers, Jones yelled " '12-12,' " meaning "police," to defendant. Almost immediately, Braun observed defendant going over a five-foot chain-link fence. Defendant's seemingly evasive, unusual behavior, accompanied by his and Jones's presence in a residential area at night, and Jones's warning defendant that police were present supported a reasonable suspicion that defendant may have been engaged in criminal activity. *Wardlow*, 528 U.S. at 120 ("While flight is not necessarily indicative of ongoing criminal activity, *Terry* recognized that officers can detain individuals to resolve ambiguities in their conduct."); *People v. Edward*, 402 Ill. App. 3d 555, 562-63 (2010) (the police had reasonable suspicion to perform a *Terry* stop where they observed three men walking down a residential street at 2:30 a.m., two of whom were pulling a wheeled garbage can down the sidewalk).

¶ 24    Further, Braun heard metal striking concrete as defendant jumped over the fence. When Fonseca chased after the fleeing defendant, Braun went over the same fence as defendant and found the handgun on the pavement where defendant had landed. There were no other people outside or in the alley at the time. Braun could therefore reasonably infer that defendant had dropped or thrown the handgun. The observation of a firearm and a defendant's attempt to flee can give rise to probable cause to believe that the defendant lacked a concealed carry license, which is necessary to lawfully carry a concealed or partially concealed firearm. See *People v. Thomas*, 2019 IL App (1st) 170474, ¶¶ 37-38. Thus, this conduct is sufficient to support the officer's reasonable suspicion of criminal activity. *Timmsen*, 2016 IL 118181, ¶ 9 (probable cause is a higher standard than reasonable suspicion). Braun's reasonable suspicion that defendant illegally possessed a

firearm is attributed to Fonseca, and thus provided Fonseca with additional reasonable suspicion to detain defendant. See *Maxey*, 2011 IL App (1st) 100011, ¶ 54.

¶ 25    Under the totality of the circumstances known to the police officers here, we find they had reasonable articulable suspicion that defendant might be involved in criminal activity to warrant detaining defendant under *Terry*. Defendant therefore cannot demonstrate that the unargued motion to suppress would have been meritorious, and his claim that trial counsel was ineffective for failing to bring the motion must fail. *Henderson*, 2013 IL 114040, ¶ 15.

¶ 26    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 27    Affirmed.