2021 IL App (1st) 172080-U

FIRST DIVISION
March 29, 2021

No. 1-17-2080

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County |
| v. | ) ) ) | No. 14 CR 16747 |
| DEANGELO BIVENS | ) ) | Honorable Dennis Porter, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE PIERCE delivered the judgment of the court.
PRESIDING JUSTICE WALKER concurred in the judgment and special concurrence.
JUSTICE HYMAN specially concurred.

## ORDER

¶ 1    *Held*:   The trial court did not err in denying defendant's motion to quash and suppress.

¶ 2                                        BACKGROUND

¶ 3    On August 14, 2014, defendant and co-defendant, Eddie Ford[1], were arrested and

charged with shooting and injuring Darrius Harris and shooting at Charles Gardner.  Defendant

was charged with three counts of attempt murder and one count of aggravated battery for

---

[1] Co-defendant Ford is not a party to this appeal.

shooting Harris and one count of aggravated discharge of a firearm for shooting in the direction Gardner. Defendant and Ford were tried in simultaneous but severed bench trials. Defendant was convicted of attempt murder and aggravated battery. Ford was acquitted of all charges. Defendant was sentenced to 33 years' imprisonment.

¶ 4    Prior to trial, defendant filed a motion to quash arrest and suppress evidence alleging that the arresting officers violated his fourth amendment right to be free from unreasonable searches and seizures. Defendant argued that his conduct, which was observed prior to his arrest by the arresting officers, could not reasonably be interpreted as constituting probable cause that defendant and co-defendant had committed, or were about to commit, a crime.

¶ 5    At the hearing on defendant's motion, Chicago police officer Elmer testified that on August 24, 2014 at approximately 3:40 p.m., he and his partner, officer Patrick Kelly, received a radio dispatch that a person was shot in the vicinity of Garfield Boulevard and Bishop Street in Chicago. The dispatch also indicated that a "a black, a dark sedan, four door," had "fled westbound from the location," and that the car was "possibly Infinity." The information regarding the suspect vehicle was dispatched in more than one transmission over the course of approximately one minute. There was no description of the occupants or the license plate given to the officers in either dispatch transmission.

¶ 6    After receiving the dispatch, officers Elmer and Kelly drove towards the location of the fleeing vehicle and as they got closer to the location specified by dispatch, the officers observed a black sedan driving "at a high rate of speed" away from the location of the shooting. The officers executed a U-turn in order to conduct a traffic stop on the vehicle. Officer Elmer testified that, before stopping the vehicle, he was able to see that there was a driver, but no front seat passenger, but that there was a passenger in the backseat. Officer Elmer testified that he

2

found this seating arrangement to be "peculiar" and it raised his level of suspicion. The vehicle that was stopped was identified as an Acura and was less than one mile from the location of the shooting.

¶ 7     The officers' squad car and the stopped vehicle were facing each other, hood to hood. Both officers exited their squad car with their weapons drawn and made contact with the two occupants of the vehicle, defendant and Ford. Officer Elmer identified Ford as the driver and defendant as the backseat passenger. All four windows of the vehicle were down.

¶ 8     Officer Elmer testified that he and his partner believed that defendant and Ford were armed and dangerous due to the nature of the call. The officers ordered both defendant and Ford to show their hands for officer safety. Ford complied immediately, but defendant did not. Officer Kelly informed officer Elmer that defendant had his hands hidden under a white t-shirt that he held on his lap.  Based on that information, Officer Elmer believed that it was possible that defendant was hiding a handgun underneath the white t-shirt that defendant held on his lap. Officer Kelly continued to demand to see defendant's hands. As he approached the rear passenger side of the vehicle, Officer Kelly observed spent shell casings near where defendant was sitting and relayed his observation to Officer Elmer. Defendant and Ford were ordered out of the vehicle for officer safety.

¶ 9     Officer Kelly and Officer Elmer radioed to officers at the scene of the shooting to inquire about the caliber of the casings found there. Officers Kelly and Elmer confirmed with officers on scene via radio transmission that the shell casings found in the vehicle in the area where defendant was sitting alone, and the shell casings found on scene were .40 caliber shell casings. Defendant and Ford were then placed under arrest and transported to the police station.

¶ 10    The officers did not indicate in their reports that they saw the vehicle traveling at a high rate of speed. There were no traffic citations issued to Ford based on his driving at a high rate of speed.  Officer Elmer explained that a citation for speeding was not issued because it required "lidar or radar" evidence or the opportunity to follow and pace a vehicle for speed which was not possible in this case because the officers were traveling in the opposite direction of the vehicle. Officer Elmer testified that based on his training and experience, he thought the vehicle was traveling at a higher rate of speed.

¶ 11    Officer Kelly and Officer Elmer did not know of any active search or arrest warrants for defendant or Ford at the time of the traffic stop.  They did not indicate in any report that defendant refused verbal commands to show his hands or that defendant hid his hands under a white t-shirt.  Officer Elmer testified consistent with the supplemental report he authored, that he observed the casings after defendant and Ford exited the vehicle.

¶ 12    Officer Patrick Kelly testified that he was working with his partner, Officer Elmer, on August 24, 2014, in the afternoon. At approximately 3:40 p.m., they stopped a black, four-door Acura near 1958 West 53rd Street. Officer Kelly started to approach the driver's side of the vehicle but then headed to the passenger side.  Ford was sitting in the driver's seat.  The passenger window behind the driver's side was open all the way down and Officer Kelly was able to see several shell casings, including one casing on the passenger seat.  He observed defendant sitting in the rear passenger seat with his hands underneath a white t-shirt that was on After Kelly observed the shell casings, defendant and Ford were ordered out of the vehicle.

¶ 13    Officer Kelly testified that he reviewed and signed the supplemental report that was prepared by Officer Elmer. Officer Kelly explained that the narrative in the supplemental report may have reflected Officer Elmer's observations when it stated that the shell casings were

observed after the offenders were ordered out of the vehicle. Officer Kelly stated that he personally, "observed the shell casings in the vehicle before anyone was ordered out of the car." Officer Kelly did acknowledge that the supplemental report did not state that defendant was observed with his hands concealed underneath a white t-shirt on his lap and that the arrest report also did not indicate that defendant concealed his hands underneath a white t-shirt.

¶ 14    Officer Kelly then identified a photograph of the rear of the vehicle with its tinted windows up. Officer Kelly again testified that the windows were down at the time of the stop and stated that even if the windows were up, he could have viewed the inside of the vehicle since the windows "were not completely blacked-out" by the tint.

¶ 15    The parties stipulated that if called to testify, the record keeper at the Office of Emergency Management and Communications (OEMC) of the city of Chicago would testify that the events were recorded in an event query on August 24, 2014 at 15:42:09 hours. The stipulation continued, "-- shots, Buick La Crosse at 55th and Wolcott, shots, Wolcott, Garfield, Buick La Crosse westbound black vehicle, unknown make, model, black Buick La Crosse at 55th and Wolcott, black Infinity westbound 55th Street, Derrick Harris, gunshot wound left leg knee name is Derrick Harris, 53rd Damen vehicle stopped."

¶ 16    The trial court found that the stop and subsequent arrest were proper.  The court stated:

> "Applying the law to those facts, it appears that the shooting was fairly recent. Although there is no specific testimony when they got the first call as to when they saw the car, the fact that the cars, it's similar car to the car involved in the shooting, the fact that the car is headed in the opposite direction, headed in a direction opposite headed away from the area of the shooting, let's put it that way, and the fact that the officer thought it was moving especially quickly although he couldn't say it was speeding, I

think taking all that together, I think they have a reasonable articulable suspicion that a crime has been committed so that they can stop the individuals.

Now once they are stopped, and they approach the car and the officer sees the cartridge cases in the car – by the way, if they have the authority to stop the car, they have the authority to order everyone out of the car.

So when they order everybody out and they then learn after that, that they learn from the officers at the scene of the crime that a .40 caliber cartridge is involved and that those are the same caliber cartridge casings, they had probable cause to arrest, so your motion is denied."

¶ 17    The trial court found that the officers had reasonable articulable suspicion to stop the vehicle because the vehicle was similar to the car involved in the shooting, it was traveling away from the location of the shooting, and it was moving at a high rate of speed. The court further added that the same authority exercised for the stop gave the officers the authority to order defendant and Ford out of the vehicle. Probable cause to arrest defendant arose when it was confirmed that the shell casings on the scene were the same caliber as the shell casings discovered in the backseat of the vehicle. The court denied the defendants' motions.

¶ 18    The case proceeded to trial.  After the trial court granted Ford's petition for severance, defendant and Ford were tried in simultaneous, but separate, bench trials. Devonte Johnson, who was 17 years old at time of the shooting, testified that on the day of the shooting at approximately 3:40 p.m., he was walking down Bishop Street with then 14-year-old Darrius Harris on the way to a nearby gas station when someone started shooting.  Johnson heard approximately 8 shots in total but did not know where the shots were coming from Johnson ran to a nearby alley and stayed there until police arrived.  When police arrived, officers informed

Johnson that he had been shot. It was at that time that Johnson realized that one of the bullets had grazed and injured his thigh. He was transported to Holy Cross hospital for treatment.

¶ 19    Darrius Harris testified that, on August 24, 2014, he was 14 years old and was walking down Bishop Street with Johnson when he heard approximately 9 or 10 gunshots. Harris could not tell where the gunshots were coming from, but he knew the gunshots were moving in their direction because he could hear the bullets hitting nearby bricks. Harris ran but he did not get very far due to feeling pain in his left leg. When he could no longer run, he crawled between parked cars and stayed there until neighbors emerged from their houses and began to call 911. Harris was taken to Cromer's Children's Hospital via ambulance. Harris required surgery for a broken femur he received as a result of being shot. He required physical therapy in order to regain his ability to walk.

¶ 20    Two days after the shooting, Assistant State's Attorney (ASA) Brian Briskman and Detective Lewis came to the hospital to speak with Harris in the presence of Harris's father. At trial, Harris testified that he did not remember speaking to either the ASA or the detective. Harris testified that that he did not remember telling the ASA and the detective that he saw a black four door car drive out of an alley and turn towards Johnson and him. He also claimed that he did not remember telling the ASA and the detective that the car was moving slowly, and that the passenger side of the car was facing Johnson and him. Harris further claimed that he did not remember telling the ASA and the detective that he turned away from the car when he saw the car drive out of the alley and that he turned back around to face the car. Harris claimed that he did not remember telling the ASA and the detective that he saw an African American male standing above the back-passenger door with a black handgun in his right hand. Harris did not remember telling the ASA and the detective that the African American male had a white t-shirt

covering his face.  Harris did not remember telling the ASA and the detective that seconds later he heard several gunshots. Harris claimed that he did not remember telling the ASA and the detective that he looked back and could see the black four door car drive off after he was shot. Harris claimed that he did not remember telling the ASA and the detective that he crawled to the parked cars. He did not remember getting his picture taken with his father at the hospital during the interview with the detective and the ASA and did not remember that he and his father gave the ASAS permission to write down his statement about the shooting that occurred on August 24, 2014.  Harris did not remember checking the written statement for accuracy with the assistant state's attorney in the presence of his father and the detective.

¶ 21    On cross examination, Harris testified that he was taking medication and did not recall anything that occurred during the first few days of his hospital stay because the medication left him "a little fuzzed." Harris went on to testify on cross examination that he never saw a black car, or anyone get out of a car and start shooting.

¶ 22    The State called Firearms Expert Gina Giglio, who testified that she was a forensic scientist with the Illinois State Police Forensic Science Center at Chicago and that she specialized in firearms and firearms identification. Giglio was qualified as an expert in the field of firearms identification and testified that the initial analysis of the firearm identification was done by forensic scientist Brian Zientek, but that he no longer was employed with the Illinois State Police Forensic Science Center at Chicago at the time of trial. Giglio was asked to verify the findings of Brian Zientek and analyzed several exhibits, all of which contained one Federal .40 Smith and Wesson caliber fired cartridge case. Based on her experience, she concluded that

those exhibits were fired from the same firearm. Her findings were consistent with those of forensic scientist Zientek.

¶ 23    Mary Wong testified that she was employed with the Illinois state police forensic sciences division as a forensic scientist with the trace chemistry section and was received as an expert in the field of gunshot residue analysis.  Wong testified that she tested inventories containing a pair of gloves, a gunshot residue kit that was administered to Ford, and a gunshot residue kit that was administered to defendant. She found that the analysis of the gunshot residue kit administered to defendant indicated that he either discharged a firearm with his right hand, was in the vicinity of a discharged firearm, or came in contact with a primer gunshot residue-related item within six hours of the administration of the gunshot residue kit.

¶ 24    Charles Gardner testified that he was 16 years old at the time of the shooting and that and Harris were cousins.  Gardner was walking behind Harris and Johnson when he saw a man wearing a mask come out of the alley and start shooting. He heard approximately 7 gunshots and ran away to escape the gunfire. After approximately 2 minutes, Gardner went back to the area of the shooting and saw that both Johnson and Harris had been shot. He went to the police station that same day to speak to detectives.

¶ 25    Gardner testified he participated in viewing a physical lineup of five people. However, he claimed that he did not remember signing a form before viewing the lineup and claimed that he did not remember identifying anyone as being involved in the shooting.  He also claimed that he did not remember going back to the same police station the following day and speaking with a different detective and ASA Brian Grissman. Although Gardner remembered his mother being present, Gardner claimed that he did not remember speaking with the detective or the ASA or providing a written statement. Gardner claimed that he did not remember reviewing all the pages

of the written statement for accuracy and did not remember identifying a photograph of an individual that he believed to be the shooter. He did remember taking a picture with his mother after giving his written statement, and although he claimed that he did not remember speaking with the ASA, he did remember telling the ASA personal information about himself. He also remembered telling the ASA that he was walking down Bishop Street hanging out with Harris, Johnson, and Shaun on the day of the shooting, but claimed that he did not remember telling the ASA that while walking, a four-door black car with tinted windows pulled out of the alley in front of the boys. Gardner further claimed that he did not remember telling the ASA that the car was moving slowly before turning onto Bishop and coming towards the boys, that the passenger side of the car was closest to him, that an African American male popped his head above the passenger door of the car and that Gardner was able to see the person who was holding the gun. Gardner claimed that he did not remember positively identifying defendant as the person who was holding the gun in a photograph with the ASA. Gardner testified that he remembered freezing when he heard the gunshots and staring at the shooter while he was shooting but claimed that he could not remember identifying the shooter to the detectives or the ASA because the shooter was wearing a mask. Gardner again testified that he did not remember telling the detectives or the ASA that the shooter was attempting to cover his face with a white t-shirt and claimed that he did not remember confirming with the detective and ASA that the person that he picked out of a lineup the day before speaking with the ASA was the person that was shooting; nor did he remember telling the ASA that no one forced him to pick out the shooter. Gardner claimed that he did not remember giving a written statement to the ASA, reading the first paragraph, having the ASA read the written statement while Gardner followed along, making corrections to the written statement, or signing every page of the written statement. He did

remember taking a picture with his mother at the police station at the time of the interview with the detective and the ASA but claimed that he did not remember signing the picture. Gardner testified that his inability to remember the specifics regarding the shooting was due to the fact that it happened two years prior to the trial.

¶ 26    Officer Elmer of the Chicago police department testified that he was on routine patrol with Officer Kelly on the date of the shooting.  The officers received a radio communication from dispatch of shots fired in the vicinity of Garfield Boulevard and Bishop Street and they headed in that direction.  While they were on their way, there was a subsequent 911 call of a person shot at that location as well as additional information.  As the officers continued toward the location, Officer Elmer observed a black four door sedan traveling westbound on 53rd Street at a high rate of speed. The officers conducted a U-turn, activated their emergency equipment, and executed a traffic stop.   Because the squad car and the sedan were positioned hood to hood, Officer Elmer was able to determine that there was a driver, no front passenger, and a rear passenger on the passenger side of the vehicle. Approximately three minutes had passed from the time that the call of shots fired was dispatched to the time of the traffic stop.

¶ 27    The officers originally approached the driver of the vehicle, but Officer Kelly went around to the rear passenger side where defendant was seated. Both defendant and Ford were ordered to show their hands. Ford complied immediately but defendant only complied after multiple demands from the officers.  Defendant and Ford were ordered out of the vehicle and both complied.  After they exited, Officer Elmer saw spent shell firearm casings and a white t-shirt in the rear of the vehicle where defendant was seated. The officers confirmed with other officers on the scene of the shooting that the caliber of the shell casings found on the scene

matched the caliber of the casings found in the vehicle. Defendant and Ford were placed under arrest.

¶ 28    Detective Richard Solecki testified that on August 25, 2014, he and his partners were assigned to investigate an incident involving a person being shot the previous day. At about 12:45 a.m., they met with defendant at the police station. After defendant was informed of his *Miranda* rights, defendant waived his rights and provided an oral statement. Defendant stated that Ford picked him up and they were going to the store on 51st Street and Wood Street. Defendant told detectives that when he and Ford arrived at the store, they changed their mind and proceeded to the area of 53rd Street and Damen where they were stopped by police. Defendant confirmed that he was in the back of the vehicle, but that he was only in the back seat because he wanted to take a nap.

¶ 29    Detective Solecki testified that he spoke with Charles Gardner on August 24, 2014 at the police station. Detective Solecki showed Gardner a photo lineup, but first advised Gardner using a photo lineup advisory form. Gardner said he understood the advisory form and then agreed to participate in a physical lineup. There were five men total in the physical lineup and Gardner immediately identified defendant as the shooter. Gardner did not identify Ford.

¶ 30    Evidence Technician Terrance McKitterick of the Chicago police department testified that he was assigned to process the scene of an aggravated battery on or about August 24, 2014, and inventoried five Federal Smith and Wesson .40 caliber fired cartridge cases and one complete .40 caliber Smith and Wesson cartridge. He also processed Ford's vehicle. There, he inventoried two Federal .40 caliber Smith and Wesson fired cartridge cases, a white t-shirt, and two gloves from the rear of the vehicle.

¶ 31    The parties proceeded to stipulate to the to the testimony of Chicago Policed detective Joel Krettek.  In summary, the stipulation was that on or about August 24, 2014, Detective Krettek properly administered a gunshot residue collection kit at the Area Central Detective Division on both defendant and Ford.

¶ 32    ASA Brian Grissman testified that he went to the Area Central Detective Division on August 25, 2014, the day after the shooting and in the presence of Detectives Solecki and Louis, interviewed Charles Gardner. Gardner's mother, Lauri Washington, was present because Gardner was a minor at the time of the interview. Gardner agreed to memorialize the interview with a written statement. ASA Grissman wrote the statement while Gardner followed along. Gardner made corrections to the statement before ASA Grissman, the detectives, Gardner's mother, and Gardner initialed the corrections. ASA Grissman, the detectives, and Gardner's mother, and Gardner signed every page of the written statement. ASA Grissman took a picture of Gardner and Gardner's mother once the statement was written, and then affixed the picture to the statement.

¶ 33    In addition, during the interview ASA Grissman asked Gardner to identify two photographs.  Gardner identified a photograph of his cousin, Harris, as the victim; and he identified a photograph of defendant as the shooter. Gardner also confirmed with ASA Grissman that he participated in the physical lineup and identified defendant because defendant was the shooter.

¶ 34    Gardner's written statement was published to the court. In relevant part, Gardner's statement read:

> "Charles states the person in People's Exhibit 1 is Darrius Harris. Charles states that
> Darrius is his cousin. Charles states that on August 24, 2014, at about 3:45 p.m. he was

hanging out with Darrius and two other guys named Devonte and a guy Charles knows as Shaun. Charles states that at 3:45 p.m. he was walking from 5450 South Bishop with the other three guys. Charles states they were walking to Darrius' house. Charles states that as they were walking, a 4-door black car with tinted windows pulled out of the alley right in front of him. Charles states he was about 15 feet away from the car. Charles states the car was moving slow and turned onto Bishop, coming toward him and his friends.

Charles states when he looked at the car, he saw the back passenger door opening and he saw a black handgun pointed out between the door and door frame. Charles states that when the car pulled onto Bishop, the passenger side of the car was closest to Charles, Darrius and his friends. Charles states that he then saw an African-American male pop his head above the passenger door of the car and he was able to see the person who was holding the gun. Charles states the person in People's Exhibit No. 2 is the person he saw holding the gun in the back passenger seat. Charles states that as soon as he saw the person in People's Exhibit No. 2 with the gun, he started hearing pops. Charles states he heard several pops. Charles states he believes the pops were gunshots. Charles states that he froze when he heard the shots and was staring at the person in People's Exhibit No. 2. Charles states he saw the person in People's Exhibit No. 2 had a white t-shirt on and was trying to pull it over his face. Charles states the person in People's Exhibit No. 2 was also stumbling to get back in the car. Charles states the person in People's Exhibit No. 2 eventually got back into the car. Charles states he then turned and ran into the cut. Charles states the person in People's Exhibit No. 2 stopped shooting right before he got into the car, and Charles ran because he thought he would shoot again. Charles states he was in the cut for a short time and then went back to 5450 South Bishop. Charles states

14

he then saw that Darrius and Devonte were shot. Charles states he viewed a lineup yesterday and picked out the person in People's Exhibit No. 2 as the person he saw holding a gun right before he heard gunshots. Charles states nobody told him who to pick out, or promised or threatened him with anything to pick him out. Charles states he picked out the guy in People's Exhibit No. 2 because he was the guy with the gun. Charles states that assistant state's attorney Bryan Grissman spoke to him alone and asked him how he was treated by the police. Charles states he was treated good by police and ASA Bryan Grissman."

¶ 35    ASA Grissman and Detectives Solecki and Louis then interviewed Harris in the hospital in the presence of Harris' father, Robert Lockhart.  ASA Grissman spoke with Harris before beginning the interview, during which time ASA Grissman inquired about any medication that Harris may be taking. Harris confirmed that he was taking pain medication, but that it did not affect his ability to recall the events in question.  Harris agreed to help produce a written statement. A statement was drafted, corrections were made and initialed, each page was signed by everyone present, and a photograph of Harris and Harris' father was taken and affixed to the written statement.   Portions of Harris's written statement were published to the court.  Harris confirmed that he saw a black four door car pull out of an alley and turn towards the boy and that the back passenger door opened, and an African American male stood up and began shooting while attempting to cover his face with a white t-shirt.

¶ 36    The State rested. Defendant and Ford individually moved for a directed finding, both of which were denied.  Defendant and Ford rested their cases.

¶ 37    Defendant was convicted of three counts of attempt murder and aggravated battery. Defendant's motion for a new trial was denied. He was sentenced to 33 years' imprisonment for attempt murder. Defendant now appeals.

¶ 38                                    ANALYSIS

¶ 39    Defendant asserts that the trial court erred in denying his motion to quash arrest and suppress evidence because the police lacked reasonable suspicion to conduct a *Terry* stop of the vehicle in which he was a passenger. Specifically, defendant claims that the police lacked probable cause to stop the vehicle because the information relied on by the police lacked necessary detail to establish that the vehicle's occupants had been involved in the drive-by shooting.

¶ 40    The standard of review applicable to a ruling on a motion to quash an arrest and suppress evidence is twofold. The trial court's factual findings and credibility determinations are upheld unless they are against the manifest weight of the evidence. *People v. Jones*, 215 Ill. 2d 261, 267-68 (2005). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *People v. Rockey*, 322 Ill. App. 832, 836 (2001). After the trial court's factual findings are reviewed, the court's ultimate legal rulings are reviewed *de novo*. *Jones*, 215 Ill. 2d at 268. We may consider the testimony presented at trial as well as the testimony at the suppression hearing when reviewing the trial court's ruling on a motion to suppress. *People v. Slater*, 228 Ill. 2d 137, 149 (2008).

¶ 41    The fourth amendment to the United States Constitution provides the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const., amend. IV. Reasonableness under the fourth amendment generally requires a warrant that is supported by probable cause. *Jones*, 215 Ill. 2d at

269. One exception to the warrant requirement arises when officers perform an investigative stop based on reasonable suspicion that a crime has been, or is about to be, committed. *People v. Sims*, 2014 IL App (1st) 121306, ¶ 8.

¶ 42    Courts analyze the reasonableness of a temporary investigative stop pursuant to the principles set forth in the United States Supreme Court case of *Terry v. Ohio*, 392 U.S. 1 (1968). See *People v. Gherna*, 203 Ill. 2d 165, 177 (2003). A *Terry* stop is a type of police-citizen encounter, which allows for a brief investigative detention, but must be supported by a reasonable, articulable suspicion of criminal activity. *Terry*, 392 U.S. at 21; 725 ILCS 5/107-4 (West 2014). An officer may make an investigatory stop of any person if he or she "reasonably infers from the circumstances that the person is committing, is about to commit or has committed" a criminal offense. 725 ILCS 5/107-14 (West 2014). The question is whether the facts available to the officer warrant a person of reasonable caution to believe that the action which the officer took was appropriate. *People v. Houlihan*, 167 Ill. App. 3d 638, 642 (1988). An evaluation of a *Terry* stop necessarily entails balancing the need for the seizure against the invasion that the seizure entails. *Terry*, 392 U.S. at 21.

¶ 43    Additionally, "when officers are working in concert, reasonable suspicion or probable cause can be established from all the information collectively received by the officers even if that information is not specifically known to the officer who makes the arrest." *People v. Maxey*, 2011 IL App (1st) 100011, ¶ 54. Moreover, "arresting officers may rely upon radio transmissions to make a *Terry* stop or an arrest even if they are unaware of the specific facts that established reasonable suspicion to initiate a Terry stop or probable cause to make that arrest." *Id.*

¶ 44    Given the totality of the circumstances, the officers' decision to stop defendant was proper under *Terry*.  Prior to stopping the vehicle, the officers were made aware of a drive-by

shooting that occurred and received a general description of the vehicle involved via a radio transmission. Shortly thereafter, the officers encountered defendant's car, which matched a description of the suspect vehicle and which was traveling at a high rate of speed away from the shooting, as described in the radio transmission. Further, the officers observed that there was a person driving the vehicle and an occupant in the rear passenger side of the car, but no front passenger. This seating arrangement would allow a backseat passenger to discharge a firearm from either side of the car without injuring the driver. All of these observations were made within three minutes of the initial call of a person shot. The totality of the circumstances indicated defendant may have been involved in criminal activity and the radio dispatch provided the officers reasonable articulable suspicion to stop the vehicle. See *Maxey*, 2011 IL App (1st) 100011, ¶ 58 (where radio dispatches regarding a crime indicated a slender African American male, driving a red or burgundy car with distinctive license plates was involved, the officer's stop of the defendant matching this description within one mile from the crime scene was justified under *Terry*).

¶ 45    The facts of this case are like those in *People v. Rodriguez*, 387 Ill. App. 3d 812 (2008). In *Rodriguez*, a drive-by shooting occurred resulting in the murder of the victim. The shooting occurred at approximately 9:30 p.m. on April 1, 2020, in the vicinity of 8707 South Escanaba Street in Chicago. *Id.* at 813. A police officer testified that on that day, subsequent to the shooting, he was working in an unmarked vehicle when he heard over the police radio that a man had been shot near 8707 Escanaba Street. The suspects were described as " 'two youthful Hispanics in a 4 door light gray or light blue Cadillac' " with " 'some damage * * * to the passenger's side of the vehicle.' " *Id*. at 817-18. At approximately 10:20 p.m., the officer was about one mile from 8707 South Escanaba Street, when he observed Rodriguez driving alone in a

vehicle matching the description of the shooter's vehicle. *Id.* at 818. The officer conducted a *Terry* stop and called on the police radio for detectives to bring the witnesses to their location. *Id.* After the detectives transported the witnesses, they identified the vehicle and Rodriguez. *Id.* The defendant appealed his conviction and we held that when the officer "spotted a vehicle that matched the description of the shooter's vehicle, as relayed over the police radio * * * [he] had the reasonable suspicion required for a brief, investigative detention, commonly known as a *Terry* stop." *Id.* at 829-30.

¶ 46    Similarly, in the present case, when the officers spotted a vehicle matching the description of the vehicle involved in the drive-by shooting that had been relayed over the police radio only minutes before, which was traveling at a high rate of speed away from the scene of the shooting, the officers had the reasonable, articulable suspicion required for a *Terry* stop.

¶ 47    We find defendant's reliance on *People v. Lopez*, 2048 IL App 1st 153331 and *In re D.L,*. 2017 IL App 1st 171764 to be misplaced. In *Lopez*, 2018 IL App (1st) 153331, this court analyzed the reliability of a tip of unknown origin. The arresting officer received information from another officer about "a DUI driver" in a black Ford Expedition with a partial plate number of "NZ 1." *Lopez*, 2018 IL App (1st) 153331, ¶ 4.  The arresting officer spotted a black Expedition with a plate beginning with "N 211" and although the driver of the Expedition had not committed any traffic violations, the officer turned on his emergency lights and pulled the Expedition over. *Id.* After determining that the defendant's state identification was not valid, the officer arrested him. *Id.* ¶ 6. The arresting officer did not know the identity of the drunk driver from the tip, nor was he aware of the time frame between the initial report of drunk driving and his traffic stop. *Id.* ¶ 4. The trial court denied defendant's motion to quash the arrest and suppress the evidence. *Id.* ¶ 7.

¶ 48    This court reversed his conviction finding that "where there is no evidence that the tipster gave a name or contacted the police through an emergency number, 'the tip must be treated as an anonymous one, and its reliability hinges on the existence of corroborative details observed by the police.' " *Id.* ¶ 22 (quoting *People v. Smulik*, 2012 IL App (2d) 110110, ¶ 8). The court found that the officer had not observed any details sufficient to corroborate the tip of a drunken driver and although the officer confirmed the location, direction, make, color, and partial plate of the Expedition from the tip, none of these details indicated that the driver was engaged in criminal activity. *Id.*

¶ 49    *Lopez* is distinguishable from the instant case in that the traffic stop in Lopez was based on an anonymous tip which provided a conclusory allegation of drunk driving. In other words, there were insufficient facts to even determine that the crime of a DUI had occurred. The *Lopez* court took issue with the fact that "nothing in the record indicate[d] the source of the tip at issue." *Id.* at ¶ 22.  Notably, the court specifically distinguished 911 calls from other kinds of tips, stating that calls made through a 911 emergency system are "more likely to be reliable than otherwise." *Id.* at ¶ 22.   Regarding the DUI tip in the case before it, the *Lopez* court found that "the tip was neither reliable nor sufficiently detailed to justify a traffic stop" and held that the officer violated the defendant's "constitutional right to be free from unreasonable seizure" *Id.* at ¶ 28.  On the contrary, the source of the information provided to Officers Elmer and Kelly was both reliable and sufficiently detailed to justify a traffic stop as the information relayed to them via police radio was based on a 911 call of an actual crime having been committed.

¶ 50    *In re D.L.*, 2017 IL App (1st) 171764, officers responded to a call of shots fired but were not given information about the identity of the suspects. On the way to the location indicated, the officers observed two individuals " 'walking quickly' " away from the area of the shots-fired

call. *Id.* ¶ 5. There were no other people in the area. *Id.* One of the officers testified that he attempted to conduct a " 'street stop' " of the two individuals " '[to] have a conversation about the shot[s] fired call and if they heard anything.' " *Id.* The officers approached and told D.L. and the other individual to stop so that they could have a conversation about the shots fired call. *Id.* ¶ 6. D.L. ran and the man with him complied. One of the officers chased after the respondent and detained him. *Id.* The officer conducted a pat-down of the respondent, recovered a handgun, and placed the respondent under arrest. *Id.* ¶¶ 7-8.

¶ 51    The respondent's motion to quash arrest and suppress evidence was granted. The trial court reasoned that the only information the officers had about the shots fired call was the location. *Id.* ¶ 12. The court noted that the officers did not have a description of the individual or individuals involved. *Id.* At the time they attempted to conduct the *Terry* stop, the only information that the officers had was that the respondent was walking quickly away from an area where shots had been fired. *Id.*

¶ 52    The State appealed but conceded that the officers did not have a legitimate basis to conduct an investigatory stop of the respondent at the time they initially ordered him to stop. However, the State argued the respondent was only seized under the fourth amendment when the officer detained him after chasing him. *Id.* ¶¶ 20-21. We accepted the State's concession but rejected its argument that the respondent's flight justified the stop, finding that flight alone was insufficient to establish reasonable suspicion that a person has committed, or is about to commit, a crime. *Id.* ¶ 28 (citing *People v. Hyland*, 2012 IL App (1st) 110966, ¶ 32). We noted that reasonable suspicion justifying a *Terry* stop only arises when flight is coupled with other factors that may support reasonable suspicion and that no such other factors existed in that case. *Id.* ¶ 29.

¶ 53    Unlike *D.L.*. the totality of circumstances at the time of the stop gave Officers Elmer and Kelly more than sufficient reasonable, articulable suspicion to conduct a temporary investigative stop of defendant and Ford for the shooting of Harris. The *Terry* stop was based on the totality of the circumstances known to the officers at the time including:  (1) a drive-by shooting resulting in the shooting of one individual had been reported to the Office of Emergency Management and Communication (OEMC) and transmitted *via* police dispatch; (2) the vehicle being driven by Ford, in which defendant was a passenger, matched the general description provided by police dispatch *via* the OEMC; (3) the officers encountered the vehicle within three minutes of the initial police dispatch; (4) at the time of the stop, the vehicle was in close proximity to the location of the drive-by; (5) the vehicle was traveling away from the scene of the drive-by shooting at a high rate of speed near the time of the shooting; and (6) defendant sat in the rear passenger seat, a position that would facilitate the firing of a firearm from either side of the vehicle.  As the trial court properly determined, "all of that together," is more than enough to not only meet, but to surpass, the burden of reasonable articulable suspicion that a crime had been committed.  As such, the trial court properly denied defendant's motion to quash and suppress.

¶ 54                                      CONCLUSION

¶ 55    For all the reasons stated herein, we affirm the judgment of the trial court.

¶ 56    Affirmed.

¶ 57    JUSTICE HYMAN specially concurring:

¶ 58    While I concur with the court's judgment, I write separately to emphasize that the trial court's denial of Bivens's motion to suppress passes muster by the barest of margins. This case turns entirely on whether the officers possessed a reasonable, articulable suspicion sufficient to justify their *Terry* stop of a generic black, four-door sedan. Because no bright-line rule exists,

*People v. Timmsen*, 2016 IL 118181, ¶ 18, we owe officers and the public more precise guidance.

¶ 59    The law requires, absent probable cause, that officers have a reasonable, articulable suspicion to justify an investigatory detention, a standard that "protect[s] innocent persons from *** 'overbearing or harassing' police conduct carried out solely on the basis of imprecise stereotypes of what criminals look like, or on the basis of irrelevant personal characteristics such as race." *United States v. Sokolow*, 490 U.S. 1, 13 (1989) (Marshall, J., dissenting) (citing *Terry v. Ohio*, 393 U.S. 1, 30 (1968)). "To deter such egregious police behavior," officers must base their suspicion on "specific and articulable facts." *Id.* (citing *Terry*, 393 U.S. at 21).

¶ 60    Here, the universe of facts and inferences supporting the officers' reasonable, articulable suspicion is snug. The trial court made just four findings of fact: (i) the shooting was "fairly recent," (ii) the vehicle was "similar" to the one involved in the shooting, (iii) the vehicle was "headed away from the area of the shooting," and (iv) the officer "thought it was moving especially quickly, although he couldn't say it was speeding." While no fact, considered in isolation, seems suspicious, taken together, they justify the officers' actions.

¶ 61    Proximity to an area of expected criminal activity does not itself suffice to support an investigatory detention. *People v. Hubbard*, 341 Ill. App. 3d 911, 918 (2003). But proximity to the scene of a specific, recently reported crime "provides substantially more suspicion." *Id*. Here, the stop occurred near 1958 West 53rd Street, "[a]pproximately three minutes" after dispatchers relayed a call of shots fired near "the vicinity of Garfield and Bishop." We may take judicial notice by using Google Maps that 1.1 miles separate the two locations, see *People v. Stiff*, 391 Ill. App 3d 494, 503-04 (2009), Google Maps,

23

https://www.google.com/maps/dir/W+Garfield+Blvd+%26+S+Bishop+St,+Chicago,+IL+60636/ 1958+W+53rd+St,+Chicago,+IL+60609/ (last visited Mar. 14, 2021).

¶ 62    The location of the stop is essential because officers may form a reasonable, articulable suspicion, in part, when "observed individuals are located in the general area where the fleeing suspects would be expected to be, given the time of the crime and the distance of the crime." *People v. Simpson*, 2015 IL App (1st) 130303, ¶ 25. In *Simpson*, a police officer saw a "late-model black car" heading southbound "immediately after receiving a dispatch that suspects from a home invasion were fleeing in a late-model black vehicle southbound on [street identified by dispatch]." *Id.* We found the vague car description, recency of the dispatch, and car's direction of travel— alongside testimony that the crime occurred in the early morning hours when few vehicles were on the road—created reasonable suspicion for a brief *Terry* stop. *Id.*

¶ 63    In this case, we have a similar but marginally less vague description. Officers learned via radio dispatch that "a black, a dark sedan, four-door *** fled westbound from the location" of the shooting, "possibly" an Infiniti. Elmer testified that as he "passed 53rd Street driving southbound, [he] looked eastbound left on 53rd Street and observed a black sedan, what appeared to be a black sedan" and "it appeared to be driving at a high rate of speed towards Damen Street." The officers stopped the car. That the car turned out to be an Acura does not negate the reasonableness of their suspicion considering the unremarkable nature of the modern four-door sedan and the equivocation in the description. The law permits temporary, investigatory detention where officers reasonably infer involvement in criminal activity, *id.* ¶ 23, and *Terry* stops do not necessarily require descriptions of the vehicle. See, *e.g., People v. Walters*, 256 Ill. App. 3d 231, 235 (1994); *People v. Starks*, 190 Ill. App. 3d 503, 507-08 (1989).

¶ 64    Elmer also testified that the car traveled west, away from the scene of the shooting, at a "high rate of speed." That the officers could not say the car traveled over the speed limit is of little relevance. See *People v. Rozela*, 345 Ill. App. 3d 217, 227 (2003) ("[T]he officer's declination to charge the defendant with the traffic violation that ultimately leads to [an arrest] is not relevant to whether the officer had reasonable suspicion to stop the defendant."). Because reasonable, articulable suspicion involves a "less exacting standard than probable cause," officers may make a *Terry* stop even where they do not see someone violate the law, so long as they act on more than a mere hunch. *People v. Thornton*, 2020 IL App (1st) 170753, ¶ 26. Even where innocent conduct might otherwise explain away isolated facts or inferences, viewed together, they may give rise to a reasonable, articulable suspicion. *People v. Biagi*, 2017 IL App (5th) 150244, ¶ 52. The record shows the officers' reasonable belief that they had located a fast-moving car in a general area where a fast-moving car might be, given the time of the crime and the car's distance from the crime scene. *E.g., Simpson*, 2015 IL App (1st) 130303, ¶ 25. Thus, the officers had a proper basis for performing the *Terry* stop.

¶ 65    In reaching this conclusion, I would not rely on *People v. Rodriguez*, 387 Ill. App. 3d 812 (2008). See *supra* ¶ 45 ("[t]he facts of this case are like those in ***Rodriguez."). In *Rodriguez*, we found sufficient reasonable, articulable suspicion for an officer to briefly detain an individual driving "a vehicle that matched the description of [a] shooter's vehicle, as relayed over the police radio." *Rodriguez*, 387 Ill. App. 3d at 829-30. The radio dispatch described the suspects as "two youthful Hispanics in a 4 door light gray or light blue Cadillac with some damage to the passenger's side of the vehicle" *Id.* at 817-18 (internal quotation marks omitted). The officers who stopped Bivens sought a black, four-door sedan with no unique, identifiable markings like passenger-side damage.

¶ 66     The majority also cites *Maxey*, *supra* ¶ 44, despite the radio dispatch there describing the suspect as a "male, African-American, 6 feet 2 inches tall, skinny, and driving a red or burgundy-colored automobile with temporary license plates." *People v. Maxey*, 2011 IL App (1st) 100011, ¶ 57. *Maxey*, like *Rodriguez*, involved a vehicle description with a specific, identifiable trait: a temporary license plate. And unlike *Maxey* and *Rodriguez*, the officers here had no information about the age, race, or size of the occupants.

¶ 67     Also, the majority relies on facts neither relevant nor supported by the record: (i) the nature—rather than the content—of the 911 call and (ii) the seating arrangements of the car's occupants. See *supra* ¶ 53. I would limit review to facts the trial court expressly considered.

¶ 68     While a tipster's use of the 911 emergency system offers an "indicator of veracity," it does not invariably make an officer's subsequent suspicion any more reasonable. *Navarette v. California*, 572 U.S. 393, 400-02 (2014). Even reliable tips justify temporary, investigatory detention where they give rise to a reasonable, articulable suspicion. *Id.* at 401 (citing *Terry*, 392 U.S. at 30). Once we find the call reliable, we then address whether the information provided justifies a *Terry* stop. See *People v. Shelton*, 2020 IL App (2d) 170453-B, ¶¶ 18, 20.  The 911 call's reliability does not make the information relayed any more or less suspicious. I would leave the first factor, *supra* ¶ 53, out of the analysis altogether.

¶ 69     I would similarly leave the sixth factor, *Id.*, out of the analysis. While Elmer testified that he could see "no front passenger, but that there was a rear passenger" before stopping the car, he viewed the seating arrangement as "a bit peculiar." That is all he said on the subject. When the State asked him whether that "raise[d] [his] suspicions based on [his] training and experience," an objection by Bivens's counsel interrupted the questioning—and though the trial court overruled the objection, Elmer never got the opportunity to answer because the State failed to re-ask the

question. The record lacks any indication Elmer thought, as the State argued, that Elmer's training and experience might allow him to reasonably infer the seating arrangement "would allow a backseat passenger to discharge a firearm from either side of the car without injuring the driver," *Supra* ¶ 44.

¶ 70    Even ignoring the first and sixth factors, I agree the officers possessed sufficient reasonable, articulable suspicion to perform a *Terry* stop. But I disagree that the officers had "more than enough to not only meet, but to surpass, [that] burden." *Supra* ¶ 53. The facts here deserve treatment as a close call.